## NATIONAL LABOR RELATIONS BOARD v. JACKSON PRESS, Inc.

### No. 10702.

United States Court of Appeals
Seventh Circuit.

Jan. 29, 1953.

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, Louis Schwartz, Attorney, National Labor Relations Board, Washington, D. C., George J. Bott, General Counsel, and Frederick U. Reel, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

John H. Doesburg, Jr., Chicago, Ill., for respondent.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

The National Labor Relations Board (hereinafter called Board) petitions for enforcement of its order of October 18, 1951, against The Jackson Press, Inc. (hereinafter called respondent). The Board found that respondent interfered with, restrained, and coerced its employees in the exercise of their rights under the Act,[1] refused to bargain with representatives of its employees, and unlawfully refused to reinstate its employees who had gone out on strike.

Respondent is a job printing company located in Chicago, employing 50 to 60 people, and has an integrated plant operating typesetting and binding machines, as well as printing presses. The press, bindery and shipping sections are situated in a large room of the approximate dimensions of 100 feet by 100 feet. The printing presses occupy about 60% to 70% of the space in this room, the balance being devoted to the bindery and shipping operations. The presses, and the cutting and folding machines are not intermingled, but neither partitions nor walls separate these departments.[2] John R. Thornton was the president of respondent. Bernard I. Stecki was vice president and general manager, and supervised the firm's production activities. Respondent employed a supervisor or foreman named Bart Aiani, who supervised not only the press employees but also other production departments.

---

1. National Labor Relations Act, 29 U.S. C.A. §§ 151–166, as amended by the Labor-Management Relations Act, 1947, 29 U.S.C.A. §§ 151–168.

2. The trial examiner noted that one or two presses and some locker space were located in the southeast corner of the room, and that they were partly separated from the bindery by a wall 15 feet to 20 feet in length. He stated that the wall extended for so short a distance that "I do not regard it as an effective or substantial barrier between the press and bindery departments."

The unions involved are locals of the International Printing Pressman and Assistants Union of North America. In the Chicago area Local 3 asserts jurisdiction over pressmen and apprentice pressmen; Local 4 asserts jurisdiction over press assistants and apprentice press assistants. Local 4 has also asserted jurisdiction over and bargained for cutters and folders in at least six other printing plants in the Chicago area. Local 3 and Local 4 often conducted organizing campaigns jointly. One Finkel was organizer for Local 3, and Hetzer and Doyle were organizer and president respectively of Local 4.

On September 18, 1949, a substantial number of the pressroom employees attended an organization meeting called by Finkel and Hetzer. The following day these two men, in addition to Doyle, called on Thornton and stated that the employees of "The Jackson Press Room" had designated them as their bargaining agents. This was the first knowledge that the officers of respondent received concerning union organizational activities in the plant. Thornton suggested he desired an opportunity to consult his attorney, and a meeting was arranged for the following day, in downtown Chicago, between the three union officials and Thornton, Stecki, and Attorney Doesburg.

At the meeting on September 20 Hetzer advised Thornton that the unions represented a majority of the pressroom employees. After some discussion either Attorney Doesburg, representing respondent, or a union official suggested that the representation question go to the Board for resolution. As the trial examiner found, "At least by tacit understanding, the parties agreed that the recognition question would be deferred until the unions established their claim of representation by use of the Board's procedures." At this meeting Thornton asked Hetzer for proof of majority representation, and Hetzer handed him a list of employees designated, "Day Shift," and asked whether the individuals listed were respondent's pressroom employees. The name of Foreman Aiani was included. Thornton, recognizing only a few names on the list, turned it over to Stecki who agreed that the persons listed "were employed in the pressroom." On the same day the unions wrote a letter to respondent stating that they represented "a substantial majority of the employees in the pressroom," and requested recognition as "the sole and exclusive bargaining agency for the above named unit."

On the afternoon of September 20 the unions filed with the Regional Office of the Board a representation petition describing the appropriate unit as "all journeymen and apprentice pressmen, and all press assistants and apprentice press assistants." It was not until the Regional Office notified the respondent of the filing of this petition, which notice was received on September 23, that respondent had any notice that the unit claimed excluded the cutters and folders who worked in the pressroom, as well as the maintenance man who usually worked in that room.

On October 12, the Regional Office of the Board held a conference with the parties to discuss the procedure for handling the union petition. Attorney Doesburg questioned both the propriety of a single unit being represented jointly by two locals, and also the composition of the unit claimed in the petition. The possibility of a consent election being held was discussed, but Doesburg informed the group that he was going to be absent from the city during November and that the election could not be held before December. A field examiner was called in, and he explained to the group that under the schedule of the Regional Office then existing a hearing could not be held for five or six weeks, which meant that an election could not be conducted before December or January. Union officials claimed that they were being pushed around and threatened respondent with "a sidewalk fight." On October 15, three days after the conference, the union held a meeting of the employees who had signed up and the employees there passed a resolution for a strike. On October 18 the union withdrew its petition for an election and without further notice fifteen employees went out on strike. Although the operations of the pressroom were considerably curtailed, it continued

to function and replacements were made from time to time for those employees who had gone on strike. By November 2, 1949, all such vacancies had been filled. On March 31, 1950, the strikers unconditionally applied for reinstatement. Respondent replied on May 1 stating that the strikers would be given preference, in order of their application, only as jobs became available.

In the period prior to the strike, Thornton twice sent letters to each pressroom employee. In his letter of September 22 he pointed out that employees had the right to belong or not to belong to a union, and expressed hope that they would not join a union and thus preserve the right of each individual to deal directly with management. On September 29 he wrote another letter, pointing out that union shops operated under rigid apprentice and seniority rules and contrasting conditions in respondent's plant with those in plants operated under union rule. The tone of the letters being temperate, the trial examiner found that their contents were protected by the provisions of Sec. 8(c) of the Act. The Board adopted this finding.

The critical issue in this case is whether there is any substantial evidence to support the Board's conclusion (contrary to the finding of the trial examiner) that respondent's refusal to bargain with the unions was unlawful, and was caused not by a good faith doubt of the union's majority but rather by a desire to gain time within which to dissipate the union's majority, or as sometimes stated, to gain time within which to undermine the union. This case was decided by a panel of three members of the Labor Board. On this critical question, Member Reynolds agreed with the trial examiner. The other two Board members reached a contrary conclusion. They found that not only did the respondent unlawfully refuse to bargain with the unions on September 20 and September 22, but also "at all times thereafter."

Considering first the period prior to the strike, we think that the Board's finding that the respondent unlawfully refused to bargain collectively with the union on September 20 and September 22 is not only unsupported by substantial evidence on the record as a whole, but that it is contradicted by all of the evidence in the record.

When an employer is faced with a demand for recognition by a union, it may in good faith withhold recognition until the union's representation claims are established by a Board conducted election. N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 758; North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887, 889; Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732. However, such refusal of, or delay in, recognition may not be for the purpose of gaining time in which to undermine the union or to dissipate its claimed majority. N. L. R. B. v. Federbush Co., Inc., 2 Cir., 121 F.2d 954. A refusal to bargain inspired by such a purpose is not in good faith and is a violation of Sec. 8(a)(5) of the Act.

On both September 20 and September 22, as hereinbefore pointed out, the unions had asked respondent to bargain with them as representatives of the pressroom employees. Just what the term included when applied to respondent's employees is ambiguous. The trial examiner suggested that the term might have meant one thing to the unions and another to respondent. However, it is certain that it was not until September 23, when respondent received the notice from the Regional Office of the Labor Board, that it was advised as to the more restricted occupational boundaries among the pressroom employees which the unions claimed to represent.

In several cases, the Board has considered situations where there was ambiguity as to the unit of employees which was covered in a representation petition. Applicable here is the statement of the Board in Bailey Grocery Co., 100 N.L.R.B. No. 94, 30 L.R.R.M. 1321, "In view of the prohibition of the Act against recognition by an employer of a union which does not represent a majority, we do not believe it incumbent on an employer to resolve an ambiguity in a request to bargain. On the contrary we believe that a union repre-

sentative, who is presumably versed in labor matters, should clearly define the unit for which recognition is sought. Such a requirement imposes on the union representative only the obligation to say what he means. Failing to do so, he cannot be considered as having made the sort of request to bargain which imposes upon an employer a legal obligation to comply."

Disregarding the finding of the trial examiner [3] the Board largely based its decision upon the list of employees which was handed to Thornton at the September 20 meeting, but even union witnesses did not contend that this list was for the purpose of defining the proposed unit. It was erroneously captioned "Day Shift" although the list included the names of night shift employees. It included the name of Foreman Aiani, who obviously could not properly be a member of the bargaining unit. Sec. 9(a) of the Act requires that appropriate bargaining units be confined to "employees," and Sec. 2(3) of the Act excludes from the category of employee any individual employed as a supervisor. See: N. L. R. B. v. International Typographical Union, 7 Cir., 193 F.2d 782. The list contained the names of nine employees who had not signed union applications.

■ We find nothing in the record to impugn the good faith of respondent in refusing to bargain with the union on September 20 and September 22. Respondent did not have a previous record of anti-union bias or activity. It appears that on said dates, respondent was aware of the industry contract between Local 4 and employers in the Chicago area, under which the union secured jurisdiction and established wage, hours and working conditions for pressroom employees, including operators of cutting and folding machines. Respondent at all times claimed that a proper unit should include all of the employees in its pressroom. Although the trial examiner and the Board concluded that a unit composed of all journeymen and apprentice press men and all press assistants and apprentice press assistants was a proper and appropriate unit, a con-

clusion of which we approve, that does not prove that respondent on September 20 and September 22 refused to bargain in order to gain time within which to dissipate the union's majority, or to undermine the union.

■ The examiner found that in the pre-strike period Aiani's conversation with employees Bahno and Satterfield, respectively, each violated Sec. 8(a)(1) of the Act. The Board seized upon these two conversations, plus two others, as its basis for finding not only violations of Sec. 8(a)(1) but to support its thesis that respondent's request for a hearing was merely a device to gain time to dissipate the union's organizational strength in the plant.

Shortly after the unions demanded recognition Thornton instructed Aiani to maintain a policy of strict neutrality and not to ask questions of the employees pertaining to the union. Aiani promised to abide by such instructions. However, some time between September 18 and October 19 Aiani did ask Bahno whether he had any intention of going along with the union. Likewise on September 18 or September 19 he asked Satterfield if he would vote for the union "if they had an election for the union," and Satterfield responded, "I think I would." No threats or suggestion of reprisals were made. It is a close question under such decisions as N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370, 372, and Sax v. N. L. R. B., 7 Cir., 171 F.2d 769, 772, whether such inquiries standing alone were a violation of Sec. 8(a)(1). The trial examiner found that the "record is barren of any evidence which I can credit that the respondent either threatened or contemplated reprisals against employees." But the Board panel as well as the trial examiner found that such inquiries did violate Sec. 8(a)(1) of the Act, and we sustain such finding. However, considering the context in which the inquiries were made, there is no basis for the Board's finding that such inquiries were also proof of respondent's violation of Sec. 8(a)(5) of the Act. The trial examiner was clearly correct in concluding

3. The dissenting Board member agreed with the examiner.

that the violations of Sec. 8(a)(1) were not operative causes of the strike.

The Board cites two additional statements by Aiani to Satterfield as violative of Sec. 8(a)(1). Without further detail, we agree with the trial examiner that considering the context in which they were made, they were not violations of that section of the Act; and that there is no basis in the record for a contrary conclusion.

In the period after the strike began, considerable bitterness and hostility was engendered. Respondent's success in obtaining replacements for the strikers caused much antagonism on the part of the strikers toward Thornton. On occasions Thornton would escort workers through the picket lines, as a result of which angry epithets were exchanged. Although the trial examiner found several of Thornton's utterances on the picket line[4] constituted violations of Sec. 8(a)(1), he found that these intemperate utterances were motivated by Thornton's resentment of the strike and the epithets addressed to Thornton by Hetzer, one of the union organizers. He concluded that it was an idle task to determine who began this campaign of villification and who excelled in it. However, he did find that Thornton's behavior during this period was not evidence of improper motivation by respondent in refusing to bargain prior to the strike. Board Member Reynolds agreed. The examiner concluded that irrespective of whether Thornton's conduct might have prolonged the strike up to November 2 (the date when the replacement of strikers was completed) the strike was still an economic one.

The Board ordered the full reinstatement of all striking employees except one Lambing,[5] without prejudice to their seniority or other rights and privileges, together with full back pay. The only basis for such an order was that the strike was caused by unfair labor practices on the part of respondent. If it were an economic strike respondent had the right to solicit the strikers to return to work, absent a showing of interference and coercion or a threat of reprisal or promise of benefits. Employees striking for economic reasons may be replaced, and if at the conclusion of the strike, positions of employment are no longer available, the employer is under no duty to rehire them. N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144, 153.

When the strike was called it was an economic strike. The unions sought to obtain by economic action what they decided not to secure through the use of the Board's processes. While there were some unfair labor practices under Sec. 8(a)(1) of the act, such occurrences did not convert the strike into an unfair labor practice strike. In order to do so, there must be proof of the causal relationship between such unfair labor practices and the prolongation of the strike. The character, status and motivation of the strike was the same on November 2 when replacements were completed as they were on October 19 when the strike was called. The examiner so found. There is no basis in the record for any conclusion to the contrary. The situation was well stated by dissenting Member Reynolds when he said, "Under these circumstances, I am constrained to agree with the trial examiner that Aiani's conduct before the strike is not sufficient to show that the respondent's challenge of the union's majority and its request for a hearing in the representation case were in bad faith and for the purpose of gaining time in which to defeat the unions. It is noteworthy that there were no other violations of Sec. 8(a)(1) before the strike. The later conduct, relied on by the majority to prove bad faith, occurred in a different context and under circumstances which do

---

4. Only one such utterance occurred between the date of the strike and November 2, when all of the strikers had been replaced.

5. Because employee Lambing was convicted in the Municipal Court of Chicago of disorderly conduct based on his attempt to sabotage a truck owned by respondent by putting sugar into the tank of the truck, his reinstatement was not ordered.

not, in my opinion, impinge on the respondent's earlier good faith challenge of the majority and the appropriate unit."

The order of the Board will be modified by eliminating Paragraphs 1(b) and 1(c) and Paragraphs 2(b) and 2(c), and by modifying the proposed notice accordingly. As thus modified the order will be enforced.