**NATIONAL LABOR RELATIONS BOARD**
v.
**THAYER CO. et al.**
No. 4728.

United States Court of Appeals
First Circuit.
June 3, 1954.
Rehearing Denied June 21, 1954.

Norton J. Come, Atty., N. L. R. B., Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., and Irving M. Herman, Atty., N. L. R. B., New York City, with him on the brief), for petitioner.

Joseph N. Welch, Boston, Mass., and Samuel M. Salny, Fitchburg, Mass. (David Burstein, George H. Foley and Hale & Dorr, Boston, Mass., with them on the brief), for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The Labor Board, under § 10(e) of the National Labor Relations Act, 61 Stat. 147, 29 U.S.C.A. § 160(e), has petitioned this court to enforce its order promulgated June 30, 1952, and directed against the Thayer Company and H. N. Thayer Company, both of Gardner, Massachusetts. Respondents are closely affiliated corporations, regarded by the Board as a single employer within the meaning of the Act. The order requires *inter alia*

the reinstatement with back pay of 103 of respondents' employees who engaged in a prolonged strike found by the Board to have been precipitated by the companies' unfair labor practice; the disestablishment of unaffiliated labor organizations held to have been supported by the respondents; the payment of a bonus to H. N. Thayer Company employees; and the termination by respondents of conduct deemed violative of §§ 8(a) (1) and 8(a) (3) of the Act.

Respondents challenge the validity of this order on numerous grounds. Their principal objections are: (1) That the findings of fact made by the trial examiner and adopted by the Board are unsupported on the record; (2) that the proceeding before the trial examiner was unfair and prejudicial to the respondents in that their counsel was not permitted during the course of the hearing to obtain the pre-trial statements given to Board investigators by certain witnesses; (3) that a state court decree enjoining the picketing of respondents' premises should have been treated in the Board proceeding as res judicata with respect to the question of reinstatement; and (4) that even on the facts as found by the Board, reinstatement was improper since the strikers were not engaged in concerted activities within the meaning of § 7 of the Act.

In determining the merits of the latter two contentions by respondents, we accept the version of the facts as found by the Board, for we are convinced after a careful reading of the long and often contradictory testimony in this case that those findings are based upon substantial evidence on the record as a whole.

Thus, for our purposes the relevant facts may be taken as the following: On January 10 and 11 of 1949, seventeen employees of the H. N. Thayer Company were discharged because of their membership in and activities on behalf of Local 154 of the United Furniture Workers of America, CIO. These dicharges were the culmination of respondents' long-standing hostility toward the UFW.

In 1940 the Thayer Company, or Plant 1 as it is called, sponsored the formation of a Workers' Council to combat an organizational drive by the Furniture Workers. A similar Workers' Council was established in 1945 at Plant 2, so called (H. N. Thayer Company). In the fall of 1948 employee dissatisfaction with the Workers' Councils at both plants, and the possibility of a cut-back in wages, led to new and intensified activity on the part of the CIO union which, on October 26, demanded recognition as the employee bargaining representative. Respondents declined to recognize the UF-W. Instead, management, in an attempt to discourage further union gains among its employees, threatened to discharge any of its workers found proselytizing for the CIO and also to close down its plants rather than deal with the union. These tactics proved successful at Plant 1 where a labor agreement was signed with the company-dominated Workers' Council on December 15, 1948.

At the H. N. Thayer Company, or Plant 2, where pro-CIO sentiment was stronger, the management refrained from negotiating a labor agreement for 1949 until after the first of that year, and in an attempt to discourage union activity on the part of its employees it withheld from them the usual Christmas bonus. Subsequently an agreement was negotiated with the company-dominated H. N. Thayer Workers' Council. This contract was circulated among the employees for individual signatures (as had been done at Plant 1) after the aforesaid discharges of January 10 and 11, 1949.

These discharges resulted in a strike by the employees at both factories. The strike commenced at Plant 2 on January 26, and at Plant 1 on January 27. From its inception it was accompanied by picketing on the part of the workers, who were admonished by their leaders to refrain from interfering with those employees who wished to remain at work.

The picketing was intensive. As many as sixty individuals circled Plant 2 at one time, and at Plant 1 one hundred and sixty marched at arm's-length distance apart. The number of pickets, however, was generally far less than this. The 160 figure included employees from other plants in Gardner sympathetically disposed to the cause of the Thayer workers. During the hours when no employees were leaving or entering the plant, only a handful of pickets patrolled the streets outside the factories. The large concentrations occurred in the early morning when the plants opened and at 4:00 P.M. when they closed.

The picket lines were fairly well-behaved, and non-striking employees were able to enter and leave the plants without serious incident. Police were present throughout the strike, and while it was often necessary for them to step in front of the pickets in order to open up the driveways leading to the plants, these police activities met with only very minor resistance on the part of the pickets.

The companies took the position from the outset that the strike was illegal and that they were privileged to discharge any of the participants. They disclosed their opinion to the strikers by an advertisement in a local newspaper and they sought legal support for their position in the courts. Their first attempt to secure an injunction against the picketing of their plants proved unsuccessful. On March 10, 1949, however, respondents did obtain from a judge of the Superior Court of Worcester County a temporary injunction, which was made permanent on March 15, on the basis of a holding that the strike was for an "illegal purpose" and was carried out by "illegal means". This injunction was ultimately sustained by the Massachusetts Supreme Judicial Court on the single ground that the picketing was conducted in an illegal manner, being violent and destructive of property.[1]

The injunction broke up the strike, and on March 15 the pickets commenced reapplying for their jobs. Eighty-six of the 103 employees covered by the Board's

1. Thayer Co. v. Binnall, 1950, 326 Mass. 467, 95 N.E.2d 193.

reinstatement order were refused reinstatement by the respondents on the ground that they had engaged in the strike and had picketed the plants. The remaining seventeen are the employees discharged on January 10 and 11 because of their union activities.

■■ With this background we turn to the question of what effect the state court injunction had on the propriety of the Board's order reinstating the discharged pickets. It must be remembered that the employees were engaged in a strike provoked by unfair labor practices. This means, of course, that under ordinary circumstances if such strikers apply for their jobs at the termination of the strike, they must be returned to their old positions irrespective of the effect that such reinstatement may have upon the tenure of new employees hired as replacements. See, e.g., N. L. R. B. v. Remington Rand, Inc., 2 Cir., 1942, 130 F.2d 919, 927, 928. Where a strike is not caused by an unfair labor practice but is economic in nature, the employer need not discharge replacements in order to rehire strikers. N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381; N. L. R. B. v. Jackson Press, Inc., 7 Cir.,

1953, 201 F.2d 541, 546. However, even in the situation of an economic strike, to avoid committing an 8(a) (1)[2] unfair labor practice, the employer generally must rehire those strikers whose positions have not been filled and must refrain from disciplining them for the concerted activity. Home Beneficial Life Ins. Co., Inc. v. N. L. R. B., 4 Cir., 1947, 159 F.2d 280; General Electric Co., 80 N. L. R. B. 174 (1948).

■■ There is an exception to the latter generalization. If an economic strike as conducted is not concerted activity within the protection of § 7,[3] then the employer is free to discharge the participating employees for the strike activity and the Board is powerless to order their reinstatement, see, e.g., N. L. R. B. v. Indiana Desk Co., 7 Cir., 1945, 149 F.2d 987. This is so because, if the particular collective action is not a protected § 7 activity, the employer commits no unfair labor practice by thus terminating the employment relation. He has not interfered with, restrained or coerced employees in the exercise of their rights guaranteed in § 7.[4] See Cox, The Right to Engage in Concerted Activities, 26 Ind.L.J. 319, 320 (1951). Therefore, since the power of the Board to order reinstatement under § 10(c)[5] is dependent

---

**2.** 29 U.S.C.A. § 158(a) (1): "It shall be an unfair labor practice for an employer—to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7".

**3.** 29 U.S.C.A. § 157: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *."

**4.** This is a paraphrase of the language of § 8(a) (1) of the Act. The employer could not be guilty of any of the other four employer unfair labor practices for refusing to reinstate employees because they engaged in a strike. Section 8(a) (2) makes it an unfair practice for an employer "to dominate or interfere with the formation or administration of any la-

bor organization * * *." Section 8(a) (3) is applicable only where the discrimination is to encourage or discourage membership in any labor organization. Section 8(a) (4) makes it illegal for an employer "to * * * discriminate against an employee because he has filed charges or given testimony under this Act". And Section 8(a) (5) imposes a duty on the employer to bargain collectively.

**5.** "* * * If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any * * * unfair labor practice, then the Board shall * * * cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: * * * provided fur-

upon its finding that an unfair labor practice has been committed, and since by hypothesis the economic strike was not caused by an unfair labor practice, it becomes crucial to the question of reinstatement of an economic striker to inquire whether the strike as conducted constituted concerted activity within the protection of § 7.

■ On the other hand where, as in the instant case, the strike was caused by an unfair labor practice, the power of the Board to order reinstatement is not necessarily dependent upon a determination that the strike activity was a "concerted activity" within the protection of § 7. Even if it was not, the National Labor Relations Board has power under § 10(c) to order reinstatement if the discharges were not "for cause"[6] and if such an order would effectuate the policies of the Act. Of course the discharge of strikers engaged in non-Section 7 activities often may be for cause, or their reinstatement may not effectuate the policies of the Act, but in certain circumstances it may.[7] The point is that where collective action is precipitated by an unfair labor practice, a finding that that action is not protected under § 7 does not, *ipso facto*, preclude an order reinstating employees who have been dis-

charged because of their participation in the unprotected activity.[8]

The respondents apparently have not recognized this subtlety, and failure to do so seems to have influenced their reasoning with respect to the effect of the state court decision.

■ As we understand it, what the respondents really are asking this court to hold is that the Massachusetts decision[9] is conclusive against reinstatement and forever bars the discharged employees from litigating this issue in another forum.

Bearing in mind the respondents' misconception that the Board necessarily has no power to order reinstatement if the striking employees engaged in a non-Section 7 activity, their theory with respect to the state adjudication appears to have two aspects: (1) They contend that the Massachusetts decision holding that the strike was conducted in an illegal manner under state law is the equivalent of a finding that the strike was not a concerted activity protected by § 7 of the Act; and (2) that the state court decision is, therefore, res judicata on the question of reinstatement of the strikers.

Turning to point (1), perhaps we may infer from the Briggs-Stratton case[10]

---

*ther* * * * No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. * * * " 29 U.S.C.A. § 160(c).

6. The "for cause" proviso added to § 10 (c) in 1947 is applicable where the employee is engaged in collective action as well as where he acts alone, H.R.Rep.No. 510, 80th Cong., 1st Sess., 38–39; and it would seem that where an employee is discharged because he engaged in collective action and the discharge is found to be "for cause", the action is not the type protected under § 7. N. L. R. B. v. Local Union No. 1229, Int. Brotherhood of Electrical Workers, 1953, 346 U.S. 464, 74 S.Ct. 172. However, a determination that an employee is not engaged in a § 7 activity does not necessarily mean that, if he is discharged for his participation in the unprotected action, the

discharge is "for cause". That depends on the surrounding circumstances. What is *cause* in one situation may not be in another.

7. See N. L. R. B. v. Elkland Leather Co., Inc., 3 Cir., 1940, 114 F.2d 221, certiorari denied, 1940, 311 U.S. 705, 61 S.Ct. 170, 85 L.Ed. 457.

8. This analytical distinction has been overlooked on many occasions. Professor Cox states: "The distinction was overlooked by the House managers in reporting the conference agreement on the Labor Management Relations Act 1947, H. R.Rep.No.510, 80th Cong., 1st Sess., 38-39 (1947) and unfortunately it has not always been observed by the Board." Cox, The Right to Engage in Concerted Activities, 26 Ind.L.J. 319 at 324, note 24 (1951).

9. Thayer Co. v. Binnall, 1950, 326 Mass. 467, 95 N.E.2d 193.

10. International Union UAWA, AFL v.

that it would be violative of the supremacy clause of the Constitution for a state court to enjoin employee activity protected under § 7. If that inference is correct, there is some merit to this aspect of the respondents' argument, for the Supreme Court has held that the States are free, at least to some extent, to regulate the means or methods by which a strike is conducted. Allen-Bradley Local v. Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154; see Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, 1953, 346 U.S. 485, 488, 74 S.Ct. 161. Putting Allen-Bradley together with Briggs-Stratton, it would follow that when a state tribunal enjoins a strike because the strike as conducted constitutes an illegal breach of the peace, the state court's determination is tantamount to a finding that the employees by their conduct have lost the protection of § 7 of the National Labor Relations Act.

Taking up the second aspect of the respondents' theory, it seems perfectly clear that, notwithstanding what has been said above, it is not accurate to say, as respondents do, that the findings of the state court are binding upon the Board under the traditional doctrines of res judicata or collateral estoppel. Such a proposition is invalid even under the respondents' assumption that the pickets in this case may be reinstated only if their conduct was protected under § 7, for the Board was not a party to the state adjudication. Nor is the Board merely a representative of the employees who were involved in the prior litigation. To some extent at least, the Board represents the public interest as defined in the National Labor Relations Act.

Be that as it may, if it were true that the Board has power to order reinstatement only after finding that the strike and the picketing are protected under § 7, a holding that the Board is bound by the findings in the state injunction proceeding might perhaps be justified (this we do not have to decide), for it might be suggested that the public interest would hardly be benefited by relitigating in the Board proceedings the precise question which was determined in the state tribunal, and which might have been brought before the Supreme Court of the United States for review on certiorari. Giving effect to the state determination, on the other hand, has the possible advantage of allowing the participants to act in reliance upon the earlier decision and might facilitate the re-establishment of labor stability in the disrupted plant. See Developments in the Law—Res Judicata, 65 Harv.L.Rev. 818 at 871 (1952).

This is all well and good if the validity of the reinstatement order depended upon a finding that the picketing was conducted within the ambit of § 7. As we have explained above, such is not the case here because the strike was caused by an unfair labor practice. The actual questions in this case are whether under the circumstances the strike conduct was cause for discharge, and if not whether reinstatement would effectuate the policies of the Act. To resolve these questions, the Board need never decide the specific question of whether the picketing was concerted activity within the protection of § 7.

Since the crucial discharge-for-cause issue and the issue of whether reinstatement would effectuate the policies of the federal Act were never litigated (indeed could not have been litigated) in the state tribunal, the respondents' sug-

Wisconsin Employment Relations Board, 1949, 336 U.S. 245, 69 S.Ct. 516, 522, 93 L.Ed. 651. The case held that a state had power to control "recurrent and unannounced stoppage of work." To reach this result the court found it necessary to decide that the collective action was not concerted activity within the meaning of § 7 of the NLRA. The tone, mood and language of the opinion strongly suggest that, if the work stoppages were protected under § 7, the state action would have been unconstitutional. Cf. Hill v. State of Florida, 1945, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782.

gestions with respect to res judicata and collateral estoppel are quite untenable.[11]

Thus we think that the state court decision did not necessarily preclude a reinstatement order, and we pass to a consideration of whether reinstatement was a proper remedy in view of the Board's own findings of fact.

The Board found that the strike was caused by the discriminatory discharges of January 10 and 11, 1949, but concluded that the strikers were not eligible for reinstatement if their collective action did not come within the scope of § 7 of the Act.[12] We have indicated that this approach is erroneous and have suggested that, if it were not, the respondents' arguments with respect to the Massachusetts decision might have been more favorably received. While the Board's misconception does not affect our reasoning above, it does bring other aspects of this case to us in a different procedural posture from what might have been anticipated.

The Board came to the conclusion that the strike and picketing were protected under § 7, and thereupon ordered reinstatement. That holding with respect to § 7 constitutes a ruling of law based upon statutory construction which we are free to examine without deference to the Board's administrative expertness. Inherent in the Board's order, however, is the implied determination that, if the picketing employees were protected by § 7, their reinstatement would effectuate the policies of the statute;[13] and in respect to such a determination, we would defer to the Board for two reasons: (1) This is a nice question of the appropriateness of the remedy confided primarily to Board determination. (2) It ordinarily may be assumed that the Board, as a part of the process of determining whether reinstatement would effectuate the policies of the Act, will balance the severity of the employer's unfair labor practice which provoked the industrial disturbance against whatever employee misconduct may have occurred in the course of the strike. Thus in reaching its decision the Board weighs two groups of facts. Such a decision has little value as a precedent in a subsequent Labor Board case because of the nuances of fact inevitable in the later situation. Therefore, if this court should conclude that the strike activity was not protected conduct under § 7, our disposition should be to remand the case to the Board in order to allow that body to make the primary administrative determination—which it has not yet made—whether under the circumstances the non-Section 7 activity was cause for discharge, and if not whether reinstatement is an appropriate remedy under the circumstances.[14]

In our view, we need not remand the case for this purpose with respect to most of the employees ordered reinstated, for we agree with the Board that generally the conduct of the strikers on the picket line was protected collective action within the meaning of § 7.

If the pickets "restrained" or "coerced" other employees in the exercise of their rights under § 7 of the

11. But cf. New York State Labor Relations Board v. Holland Laundry, Inc., 1945, 294 N.Y. 480, 63 N.E.2d 68, 161 A.L.R. 802, criticized, perhaps too mildly, by Professor Jaffe in his article, The Public Right Dogma in Labor Board Cases, 59 Harv.L.Rev. 720, 743 (1946).

12. "Like the Trial Examiner, we find that the strike voted on January 25, and commenced on January 26 and 27, 1949, was an unfair labor practice strike to protest these discriminatory discharges of January 10–11. We further find that the strikers are entitled to reinstatement, unless there is merit to any of the Respondent Companies several contentions relating to the question of whether or not the strike and the strike conduct constituted protected concerted activity." H. N. Thayer Co., 99 N. L. R. B. 1122, 1128 (1952).

13. Of course if the pickets were engaged in § 7 activities, their discharge for such activities cannot be discharge for cause.

14. Such a determination could be reviewed subsequently in this court.

Act, and if union responsibility therefor could be demonstrated, the picketing would constitute a union unfair labor practice[15] and therefore would not be a protected concerted activity under § 7. Nor would the same conduct by the picketing employees, even though not attributable to the union, be protected.[16]

■ This gives us a standard for determining what picket line conduct falls outside the protection of § 7. Certainly conduct which is not a union unfair labor practice may still be unprotected.[17] But with respect to the instant case, if there was no "coercion" or "restraint" of non-striking employees, the picketing should be considered a protected activity, for then the collective action would not have been in violation of any other federal statute;[18] nor on the facts found by the Board was the conduct on the picket line in breach of the peace and therefore enjoinable by state law.[19]

■ Thus our problem is considerably simplified. It is undisputed that those employees who wished to continue working during the strike were able to do so. The Board and the trial examiner both drew the "factual inference" that the pickets did not intend or seek to prevent employees from entering or leaving the plants. There is substantial evidence on the whole record to support this finding. The aggregate of these two facts compels a conclusion that, except for isolated incidents discussed below, the non-strikers were not restrained or coerced in the exercise of their rights under § 7, and therefore the pickets were engaged in concerted activity protected by § 7.

Certain strikers, however, participated in activities which we find were coercive, and therefore not within the scope of § 7. The trial examiner, in recommending the reinstatement of such strikers, took into consideration the fact that "the strike resulted from the flagrant unfair labor practices of Respondent Companies". This seems perfectly proper—not in justifying the employees' conduct or in concluding that their action was protected under § 7—but in deciding whether or not their discharge was "for cause" and whether their reinstatement would effectuate the policies of the Act.

The Board, as we have noted, made reinstatement turn exclusively on whether the employees' conduct was within § 7. It therefore apparently disregarded, and properly, under its approach, the

15. 29 U.S.C.A. § 158(b) (1) (A).

16. "Although section 8(b) regulates only the conduct of labor organizations and section 7 deals with the rights of employees, it seems plain that the group activities which section 8(b) forbids a labor organization to lead must fall outside the protection of section 7 when employees engage in them either with or without the direction of a union. To hold otherwise would disregard legislative history [H.R.Rep. No. 510, 80th Cong., 1st Sess., 37–40 (1947)] and create an unwarranted anomaly." Cox, op. cit. supra at 325.

17. See Perry Norvell Co., 80 N. L. R. B. 225, 240 (1948).

18. See American News Co., Inc., 55 N. L. R. B. 1302 (1944); cf. Southern Steamship Co., v. N. L. R. B., 1942, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246.

19. Mass.Gen.Laws, C. 214, § 9A, as amended, provides that no state court may issue an injunction in a case involving or growing out of a labor dispute except after finding, among other things, "(e) That the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection." It is clear on the Board's finding that such protection was afforded the respondents.

There are no other factors in the instant case which should take the strike or picketing outside the protection of § 7. Respondents have argued that the strike was in breach of a valid labor agreement. We agree with the Board that this is not so. Cf. National Licorice Co. v. N. L. R. B., 1940, 309 U.S. 350, 359–61, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 1941, 118 F.2d 874, 887, certiorari denied, 1941, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549.

fact that the strike was touched off by an unfair labor practice.[20]

■ Since we disagree with the Board on some of these individual incidents, we shall remand where we disagree, with instructions that the Board decide whether under the circumstances there was cause for the respondents' refusal to rehire the particular strikers involved in the non-Section 7 activity, and if not whether reinstatement of these employees would effectuate the policies of the Act.

We hold that the following incidents were coercive in nature and calculated to instill fear of physical harm in the non-striker victims, and are therefore not activities protected under § 7: (1) The visit to the home of George Andrews, a non-striker, by 20 or 30 men in five automobiles for the purpose of persuading Andrews to respect the picket line; (2) a similar visit to the home of James Thompson; (3) two visits by three carloads of pickets to the home of Joe Tatro for the purpose of persuading Tatro to join the strike; (4) two visits to the home of Zigmand Maliska by five cars full of strikers, for the purpose of persuading Maliska to respect the picket line; (5) a visit by five strikers at 6:30 A.M. to Theodore Raffa's home to persuade Raffa to join the strike; and (6) an attack upon Cornelius Magner, a non-striker, by 17 or 18 pickets in front of the H. N. Thayer Company.

Respondents have raised several other objections to our enforcing the order of the Board. We have examined these objections closely and find them to be without merit; however, we do deem it necessary to explore a portion of the hearing before the trial examiner.

■ Edgar Arsenault was one of the general counsel's early witnesses at the hearing. During his cross-examination respondents' counsel, Salny, asked Arsenault:

"Did you give Mr. Ramsey (attorney for the general counsel) a statement * * * ? A. I did.

"Q. Signed it? A. I did.

"Q. (To Ramsey) May I see the statement * * * ?"

When met with a refusal Salny stated: "I make demand for it on the ground that the statement which was given— I want to cross-examine this witness to demonstrate that the statement he gave a year ago and his evidence that he gave to-day are not the same."

Ramsey refused to produce the document which had not been used during direct examination for any purpose, stating that there had been no adequate foundation for its production. He subsequently relied upon a Board rule which prohibits disclosure by an attorney of information in N. L. R. B. files except upon authorization of the Board, its chairman, or the general counsel.[21]

**20.** "In reaching the same conclusion as the Trial Examiner did, we have appraised each incident without regard to the length, nature, physical or psychological setting of the strike." H. N. Thayer Co., 99 N.L.R.B. 1122, 1133, note 37 (1952).

**21.** 29 C.F.R. 102.90, since renumbered 102.87 (17 F.R. 4983):

"No regional director, field examiner, trial examiner, attorney, specially designated agent, general counsel, member of the Board, or other officer or employee of the Board shall produce or present any files, documents, reports, memoranda, or records of the Board or testify in behalf of any party to any cause pending in any court or before the Board, or any other board, commission, or other administrative agency of the United States, or of any State, Territory, or the District of Columbia with respect to any information, facts, or other matter coming to his knowledge in his official capacity or with respect to the contents of any files, documents, reports, memoranda, or records of the Board, whether in answer to a subpena, subpena duces tecum or otherwise, without the written consent of the Board or the chairman of the Board, if the official or document is subject to the supervision or control of the Board; or the general counsel if the official or document is subject to the supervision or control of the general counsel. Whenever any subpena or subpena duces tecum calling for records or testimony as described here-

758

Salny argued that under Massachusetts law the statement had to be produced. The trial examiner at Salny's request issued a subpoena duces tecum requiring Ramsey to produce this statement but he subsequently quashed the subpoena on the ground that under the Board's regulation he had no power to require the production of the documents.

Salny indicated that he would seek the consent of the general counsel and in a letter to him dated July 18, 1950, he requested that Ramsey be authorized "to produce said statement, so that I may use same in examination of said Edgar J. Arsenault.[22] As similar questions will undoubtedly arise * * * I also hereby request that the general counsel issue a general authorization to the said * * * Ramsey, authorizing him to produce, and to make available to me, from time to time as occasion may require * * * statements given to any representative of the NLRB by any witnesses who may testify during the course of said hearing."

This request was denied by the general counsel in a letter dated July 20, 1950, which indicated the reason for the denial to be Salny's failure to make "a *prima facie* showing in advance of inspection of the document that the prior statement given by a particular witness is at variance with the testimony he has given on the stand".[23] This exchange of letters appears to have ended the matter as far as the hearing before the trial examiner is concerned. Salny reported the receipt of the general counsel's letter, but did not make any further requests for pre-trial statements.

Some time after the issuance of the trial examiner's report, however, respondent companies moved to reopen the records and adduce more testimony "requesting the opportunity to cross-examine various witnesses for the asserted purposes of impeachment and contradiction on the basis of the affidavits or statements such witnesses had given to Board agents during the course of investigation and preparation for the trial of this case." Salny in an accompanying affidavit stated that he had not made demands for pre-trial documents of the other witnesses earlier because of the general counsel's letter which rejected his request for authorization.

The Board denied this motion.

Respondents argue that they had a right to obtain these statements and that the disregard of this right constitutes prejudicial error, since they did not have an opportunity properly to cross-examine the witnesses of the general counsel whose stories were believed by the trial examiner and the Board.

We do not agree. Disregarding altogether the Board's regulation, the respondents made no showing which would have entitled them to these pre-trial statements. The main thrust of their argument here is that under Massachusetts law they had an unqualified right to examine these documents. We are unable to find any case that so holds. The leading Massachusetts decision on the subject, Leonard v. Taylor, 1944, 315 Mass. 580, 53 N.E.2d 705, 151 A. L.R. 1002, we read as directly contrary to such a proposition.

inabove shall have been served upon any such persons or other officer or employee of the Board, he will, unless otherwise expressly directed by the Board or the chairman of the Board, or the general counsel, as the case may be, appear in answer thereto and respectfully decline by reason of this rule to produce or present such files, documents, reports, memoranda, or records of the Board or give such testimony."

22. The letter indicated that Salny wished the statement for "the purpose of demonstrating to the Trial Examiner that the

evidence which [Arsenault] had given was contradictory to and inconsistent with [his pre-trial statement]".

23. The letter went on to say that the rule is a "two-way street" so that the general counsel's attorney could not obtain statements given to Salny except on a *prima facie* showing that the testimony and the statement were contradictory.

It should be noted that Ramsey did use some pre-trial documents during the course of the hearing, which were always offered to Salny for his inspection.

Furthermore, there is nothing in such cases as Gordon v. United States, 1953, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, or United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337, to support respondents' position, for counsel for respondents laid no foundation whatever before he demanded the pretrial statements given by witnesses to the general counsel's investigators. His simple assertion that the statements, which were not employed during the hearing by Mr. Ramsey, were to be used for the purpose of cross-examination, hardly suffices. Cf. Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322; Lennon v. United States, 8 Cir., 1927, 20 F.2d 490.

The situation is indistinguishable in any material respect from that presented to the Second Circuit in N. L. R. B. v. Quest-Shon Mark Brassiere Co., Inc., 2 Cir., 1950, 185 F.2d 285, 289, and in N. L. R. B. v. Jamestown Sterling Corp., 2 Cir., 1954, 211 F.2d 725. We dispose of the comparable problem here in the same manner.

The Board will submit for our consideration a draft decree in conformity with the foregoing opinion.