**TEXACO, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17993.

United States Court of Appeals, Seventh Circuit.

Jan. 4, 1971.

Rehearing Denied Feb. 18, 1971.

Edwin J. Buckley, Chicago, Ill., J. M. Mitchell, New York City, Owen Fairweather, R. Theodore Clark, Jr., Andrew M. Kramer, Chicago, Ill., for petitioner; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Frank H. Itkin, Baruch A. Fellner, Attys., N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

SWYGERT, Chief Judge.

Texaco asks us to vacate an order of the National Labor Relations Board issued against the company on September 17, 1969. The Board cross-petitions for its enforcement.[1] The Board found that Texaco violated section 8(a) (1) of the National Labor Relations Act by engaging in certain unfair labor practices and section 8(a) (5) of the Act by refusing to recognize and bargain with the union designated as a bargaining agent by the employees in an appropriate bargaining unit.[2] The order requires the company to cease and desist from engaging in the unfair labor practices and to bargain upon request by the union.

1. The Board's decision and order are reported at 178 N.L.R.B. No. 72.

2. Chauffeurs, Teamsters & Helpers Local Union 215, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Texaco operates a bulk station at Evansville, Indiana where it employs a warehouseman and three truck drivers. J. H. O'Flynn, as consignee of Texaco, operates another bulk station at nearby Owensboro, Kentucky. O'Flynn employs three or four truck drivers and four warehousemen. Three additional truck drivers at Owensboro are in the employ of Texaco and are paid from and under the supervision of the Evansville station. (Hereinafter a reference to Evansville or Texaco employees shall include these three drivers).

On May 25, 1968 the six Texaco truck drivers signed application cards for membership in the union. One of the three Owensboro-based drivers (Garrett) signed his card at the request of another Texaco driver at Owensboro and testified that he did so only after stating that he did not wish to be represented by a union and would vote against it. The Evansville warehouseman also signed a card.

On May 27 the union by letter to Texaco requested recognition as a bargaining agent for: "All drivers and warehousemen at Owensboro, Kentucky and Evansville, Indiana establishments." It also filed a petition for an election with the Indianapolis NLRB Regional Office. Shortly thereafter counsel for Texaco telephoned the Regional Office and expressed the company's disapproval of a bargaining unit which commingled employees of Texaco with those of the Owensboro consignee. After discussion with the union, it was agreed to revise the unit description to read: "All Truck operators and warehousemen of the Employer operating out of its Evansville, Indiana Bulk Station." Texaco never responded to the union's prior request for recognition and it was not renewed.

On June 4 David Martin, Texaco's supervisor of employee relations for its sales division, made a speech to the seven employees of the Evansville station. In the speech Martin appraised Texaco's policies and benefits with respect to those of other companies. He stated that he was not promising benefits and that Texaco would deal in good faith with a union if the employees opted for one, but that he was asking them to vote non-union in the event of an election. He emphasized that a union's primary source of power is its ability to strike and suggested that a strike by the seven employees at Evansville would exert very little pressure on Texaco. The Board found Martin's speech to be privileged under section 8(c) of the Act.

Following his speech Martin dismissed the other Texaco representatives who were present and solicited comments from the seven employees. One or more employees raised questions about a tractor-trailer which was in dangerous condition and had not been repaired, unpaid overtime meal allowances, unpaid repair bills at Evansville and Owensboro garages, reports of pending changes in employment conditions and various restrictions pertaining to work attire. Martin deferred most of these matters until a second meeting two days later. At the second meeting he stated that the tractor-trailer would be repaired, the meal allowances and repair bills would be paid, employees would be consulted prior to any change in employment conditions and that only truck drivers required uniforms, which Texaco helped pay for, and they could wear any footwear that did not have exposed nails. Martin left the employees his New York address so that they could contact him in the future. Subsequently the tractor-trailer was repaired and the promised payments were made.

On June 17 the union filed a charge of unfair labor practice. On June 25 all seven employees by letter advised the union that they no longer desired its representation.

A majority of the Board found that Martin's post-speech solicitation of grievances and his promises of rectification restrained or coerced the employees in violation of section 8(a) (1) of the Act. It also found that Texaco had refused to bargain in violation of section

8(a) (5) of the Act. The Board ordered Texaco to cease and desist from the unfair labor practices and (one member dissenting) ordered Texaco to bargain with the union.

The company contends that the union's request for recognition as a bargaining agent for the seven employees failed to define the bargaining unit sufficiently. It says that the words "All drivers and warehousemen at Owensboro, Kentucky and Evansville, Indiana establishments" are ambiguous since some of the employees at Owensboro are employed by consignee O'Flynn and not by Texaco. Consequently it is argued that there can be no section 8(a) (5) violation since it is not incumbent on an employer to resolve an ambiguity in a request to bargain, citing NLRB v. Jackson Press, 201 F.2d 541, 544 (7th Cir. 1953), and National Can Corp. v. NLRB, 374 F.2d 796, 800 (7th Cir. 1967).

Although we agree that *Jackson Press* and *National Can* are authority for the proposition that an ambiguous demand to bargain may be ignored by the employer, they do not, on their facts, support Texaco's contention. By contrast to *Jackson Press*, there is no doubt that the request here for recognition of "All drivers and warehousemen at Owensboro, Kentucky and Evansville, Indiana establishments" included at least all the Texaco employees. If there was any ambiguity, it concerns whether, in addition to the Texaco employees, O'Flynn's employees were included in the claim of representation. Nor is the request comparable to the situation in *National Can* where the unit description was so unclear that the author of the demand letter and the Board could not agree on it.

When the unit description, although unclear, leaves no doubt as to the claim of representation of a majority of the employees, the employer is not justified in refusing to bargain. "The proper course for the employer in those circumstances is to refuse to bargain with respect to those employees whose unit status is disputed, not to wholly refuse to

bargain." NLRB v. Richman Brothers Co., 387 F.2d 809, 813 (7th Cir. 1966).

Even if there was a tenable basis for the company's failure to respond to the union's original request for recognition, it was eliminated once the unit description was revised. The clarified unit description in the request to bargain would be sufficient to support the finding of an 8(a) (5) violation. NLRB v. Waukesha Lime and Stone Co., 343 F.2d 504, 508 (7th Cir. 1965).

The company's next assertion is that the union lacked majority support. It challenges all the signature cards, except the one signed by the Evansville warehouseman, on the ground that the employees signed them solely for the purpose of obtaining an election and not in order to confer representative status on the union.

The test to be applied to determine the validity of authorization cards is the so-called *Cumberland* rule adopted by the Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 606, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Under that rule employees are bound by the clear language of what they sign unless the solicitor of the cards causes them to sign by telling them that their so doing has another effect. The rule is to be applied flexibly in order to insure employee free choice. *Id.* at 606–608, 89 S.Ct. 1918.

With the exception of the card signed by employee Garrett, the record indicates that the cards are valid under the *Gissel* test. While there was some talk of an election, it does not appear that promises of an election were the sole inducement for the signatures. We disgree with the company's contention that an assurance of an election alone disqualifies a card. As the Supreme Court noted in *Gissel:* "There is nothing inconsistent in handing an employee a card that says the signor authorizes the union to represent him and then telling him that the card will probably be used first to get an election." *Gissel, supra,* at 606–607, 89 S.

Ct. at 1936. An unambiguous card will be counted under the *Cumberland* rule "unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election." *Id.* at 584, 89 S.Ct. at 1925.

We think that *Gissel* means that there is some presumption of regularity which attaches when an employee signs an application card and this presumption is not overturned merely because an employee might have wished to be committed only to an election. The company has not demonstrated that the language of the cards is "deliberately and clearly canceled" by the activities of the solicitor. *Gissel, supra,* at 606, 89 S.Ct. 1918.

The card signed by employee Garrett cannot be used. Garrett, as already noted, signed this card at the request of fellow employees after advising them that he did not wish to be represented by a union and would vote against one. Signing a card under such circumstances is equivalent to misrepresentation by the solicitor of the card and one need not probe the mind of the signer to strike a card so obviously given for purposes other than representation. "[I]nducement of an employee who openly expresses an intention not to join the union suggests that representations concerning an election were intended to lead to a belief that the only purpose of the card was to hold an election." NLRB v. Swan Super Cleaners, Inc., 384 F.2d 609, 617 (6th Cir. 1967). As to this one card we think the Supreme Court's admonition against a "too easy mechanical application of the *Cumberland*" rule is apposite. *Gissel, supra,* 395 U.S. at 608, 89 S.Ct. at 1937. There remain, however, six valid cards and consequently the union had majority status.

The record is sufficient to sustain the Board's finding that Texaco violated section 8(a) (1) of the Act by unlawfully soliciting and reconciling grievances which the seven employees had entertained for a considerable time. Martin's post-speech activity as distinguished from the speech itself is not protected by section 8(c) since it was calculated to undermine the union and was not simply a statement of views. Gissel, *supra,* at 616–620, 89 S.Ct. 1918 (1969). While an employer may give his estimate of the economic consequences that would attend unionization, he goes beyond the protection of section 8(c) when he undertakes to resolve grievances. This Martin did when he stated that the company would pay the overdue meal allowances and repair bills and would repair the tractor-trailer. The company here went considerably beyond the mere calling of conferences and hearing complaints as found in Fairchild Camera and Instrument Corp. v. NLRB, 404 F.2d 581 (8th Cir. 1968). Texaco promised rectification and came forth with it.

It is basic that, once a majority of employees have selected a union to represent them, the employer shall deal with the union and not with the employees. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The purpose of section 8(a) (1) is to protect the employees' right to organize without interference from the employer. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Consequently the promise of benefits such as wage increases is held to be a violation of 8(a) (1) of the Act whether or not the employees or the employer initiate the suggestion. Medo Photo Supply Corp. v. NLRB, *supra.* Section 8(a) (1) reaches "not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). The conduct of Texaco was clearly calculated to induce the employees to abandon their interest in the union. This is so notwithstanding the fact that the company was legally

obligated to take the remedial steps it did take. The Board was warranted in finding that antiunion sentiment and not a sudden desire to make good its obligations motivated the payment of the overdue debts and the repair of the tractor-trailer.

It is obvious that Martin's post-speech conduct went far towards remedying the very grievances which gave rise to the union interest and destroyed for the moment at least the employees' need for greater strength. In the unusual circumstances of having their grievances remedied the employees can not be said to have been free to fairly appraise the value of unionization.

■ The company argues that the bargaining order is inappropriate since the seven employees voluntarily withdrew their request for representation. This argument overlooks the Board's finding that the employees' disassociation from the union was attributable to the unfair labor practices committed by the company. We reject the company's contention that since the trial examiner, with the Board's concurrence, found that there was no improper influence with respect to the letter, it must be conclusive of a withdrawal. Having remedied the causes for interest in a union the company did not have to employ improper means to get the employees to abandon it. The activities already discussed clearly provide the kind of objective evidence required to look beyond the face of the document signed by the employees. The record supports the Board's finding that the company's conduct was calculated to undermine the union and dissipate its majority. Implicit in such finding is the inference that the letter was the product of such conduct.

After observing that it had no reason to question the employees' original desire to be represented by the union as reflected by the authorization cards, the Board concluded that "on balance it is more appropriate to protect these employees' statutory rights and interests by directing the Respondent to recognize and bargain with their designated representa-

tive than to direct an election." We are of the view that the Board was warranted in taking this position under the facts here presented. In *Gissel, supra,* 395 U.S. at 612 n. 32, 89 S.Ct. 1918, the Supreme Court drew attention to the expertise of the Board in such matters and admonished reviewing courts to give special respect to the Board's choice of remedies. Moreover the Court there emphasized the broad discretion of the Board in the use of a bargaining order following unfair labor practices designed to destroy or weaken the employees' desire to be represented by a union. *Gissel, supra,* at 614–615, 89 S.Ct. 1918.

Enforcement of the Board's order is granted in full.