300 F.2d 699
 LOCAL 833, UAW-AFL-CIO, INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Kohler Company, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
KOHLER COMPANY, Respondent.
KOHLER COMPANY, a Wisconsin Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15961.
 No. 16031.
 No. 16182.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 11, 1961.
 Decided January 26, 1962.
 Certiorari Denied June 4, 1962.
 
 See 82 S.Ct. 1258.
 Mr. Joseph L. Rauh, Jr., Washington, D. C., and Mr. Louis H. Pollak, New Haven, Conn., of the Bar of the Supreme Court of Connecticut, pro hac vice, by special leave of Court, with whom Mr. John Silard, Washington, D. C., was on the brief for Local 833, UAW-AFL-CIO, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, petitioner in No. 15961 and amicus curiae in No. 16182. Mr. Harold A. Cranefield, Detroit, Mich., of the Bar of the Supreme Court of Michigan, on the brief for petitioner in No. 15961 and for amicus curiae in No. 16182, was presented to the Court pro hac vice. Mr. Daniel H. Pollitt, Washington, D. C., also entered an appearance for petitioner in No. 15961.
 Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Samuel M. Singer and Allan I. Mendelsohn, Attys., National Labor Relations Bd., were on the brief for respondent in Nos. 15961 and 16182 and for petitioner in No. 16031.
 Mr. Lyman C. Conger, Kohler, Wis., with whom Mr. William F. Howe, Washington, D. C., was on the brief, for intervenor in No. 15961, for respondent in No. 16031, and for petitioner in No. 16182. Mr. Ellison D. Smith, Jr., Columbia, S. C., of the Bar of the Supreme Court of South Carolina, on the brief for intervenor in No. 15961, for respondent in No. 16031 and for petitioner in No. 16182, was presented to the Court pro hac vice. Messrs. E. Riley Casey and Jerome Powell, Washington, D. C., also entered appearances for intervenor in No. 15961, for respondent in No. 16031, and for petitioner in No. 16182.
 Before WILBUR K. MILLER, Chief Judge, and EDGERTON and BAZELON, Circuit Judges.
 BAZELON, Circuit Judge.
 
 
 1
 These are petitions for review and enforcement of an order of the National Labor Relations Board concerning a strike by Local 833, UAW-AFL-CIO, against the Kohler Company. The strike began on April 5, 1954, and was still unsettled when the Board issued its order on August 26, 1960. The dispute has a long and bitter history — more typical of "a bygone era" — which is set forth in detail in the Board's decision. Kohler Co., 128 N.L.R.B 1062 (1960). In this opinion we relate only those facts required to understand the issues we consider.
 
 I. The Board's Decision and Order
 
 2
 The Board found that a disagreement over contract terms and not Kohler's alleged refusal to bargain caused the strike, but that it was prolonged by such refusals on and after June 1, 1954. On that date Kohler granted a three-cent wage increase to non-striking employees working under the conditions specified in an expired contract, but failed to make a similar offer to the Union. The Board also found that Kohler subsequently refused to bargain in good faith in the following respects, among others: by unilaterally putting into effect a second wage increase; by discharging striking employees and transferring non-striking employees without notification to or consultation with the Union; and by refusing to furnish wage information pertinent to the negotiations. The Board also determined that Kohler violated § 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 3) by discriminatorily treating some employees and unlawfully discharging others because of their participation in strike activities. In addition, the Board found that after June 1, 1954, Kohler interfered with, restrained, and coerced its employees in the exercise of their right to join labor unions and bargain collectively by engaging in surveillance and anti-union espionage, evicting certain strikers from Company-owned dwellings, and other conduct violating § 8(a) (1) of the Act.
 
 
 3
 Having concluded that Kohler's unfair labor practices on and after June 1, 1954, converted what the Board thought had been an economic strike into an unfair labor practice strike, the Board issued a remedial order directing the Company, inter alia, to reinstate strikers replaced after the June 1 unilateral wage increase,[1] excepting, however, employees discharged on March 1, 1955, for misconduct in connection with the strike.
 
 
 4
 II. Kohler's Petition for Review in No. 16182
 
 
 5
 In No. 16182 Kohler seeks review of the Board's adverse determinations. We think they are amply supported by the record considered as a whole and that Kohler's attack must fail.[2] Since we fully adopt the Board's analysis of the evidence on these matters, further discussion would serve no useful purpose.
 
 
 6
 III. The Union's Petition for Review in No. 15961
 
 
 7
 In No. 15961 the Union challenges the Board's refusal to reinstate seventy-seven employees discharged for misconduct. It alleges that the Board failed to balance that misconduct against the Company's unfair labor practices. This balancing, it contends, is required by the statutory command that the Board's remedy "effectuate the policies of the [Act] * * *."[3] National Labor Relations Board v. Thayer Co., 213 F.2d 748 (1st Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954).[4] The Union also contends that the Board should have found that Kohler failed, both in form and substance, to bargain in good faith in the unsuccessful negotiations which culminated in the 1954 strike and that the walkout was therefore an unfair labor practice strike from its inception on April 5, 1954. In the absence of such a finding, the Board ordered reinstatement only of employees whose jobs were filled after June 1, 1954. Had it found that Kohler's unfair labor practices caused the walkout on April 5, it might have ordered reinstatement of all strikers replaced by non-strikers at any time during the dispute.[5] Moreover, if the Thayer doctrine is valid, the Board should have balanced Kohler's unfair labor practices against the discharged strikers' misconduct whether it occurred either before or after June 1, 1954.[6]
 
 
 8
 A. The Discharges for Misconduct.
 
 
 9
 We first set forth the facts relevant to the Union's request that the Board be directed to reconsider its decision not to reinstate seventy-seven strikers discharged for misconduct. Their misconduct occurred in connection with three series of incidents.
 
 
 10
 First, forty-four discharges were based on participation in "belly-to-back" mass picketing ranging from presence on the picket line to a physical assault upon a non-striker. The Board found that from April 5 through May 28 this picketing prevented any person who did not have a Union pass from entering Kohler's plants. The second series of incidents involved demonstrations by large, jeering crowds outside the homes of non-strikers during the month of August, 1954. Some strikers who actively participated in the demonstrations and others who were merely present in the crowds were discharged. The third series of incidents took place near Kohler's employment office in December 1954 and January 1955 when a group of Union pickets hindered applicants from entering by blocking, pushing, and shoving some of them and by forcing others to walk around the pickets. Kohler discharged the participants.[7] The last two series of incidents accounted for twenty-one discharges.[8] The remaining twelve dischargees were members of the Union's strike committee which the Board found instigated some of the misconduct.
 
 
 11
 The trial examiner found that some of these employees had been discharged for activity which did not constitute misconduct or which Kohler had condoned. Accordingly, he recommended their reinstatement. But the Board reversed the examiner's findings. We put aside the Union's attack upon the Board's reasons for reversal,[9] and turn to the Union's contention that, in any event, we should direct the Board to reconsider the reinstatement issue in light of the Thayer doctrine.
 
 
 12
 B. The Application of the Thayer Doctrine.
 
 
 13
 Thayer holds that where an employer who has committed unfair labor practices discharges employees for unprotected acts of misconduct, the Board must consider both the seriousness of the employer's unlawful acts and the seriousness of the employees' misconduct in determining whether reinstatement would effectuate the policies of the Act.[10] Those policies inevitably come into conflict when both labor and management are at fault. To hold that employee "misconduct" automatically precludes compulsory reinstatement ignores two considerations which we think important. First, the employer's antecedent unfair labor practices may have been so blatant that they provoked employees to resort to unprotected action.[11] Second, reinstatement is the only sanction which prevents an employer from benefiting from his unfair labor practices through discharges which may weaken or destroy a union. In the Matter of H. N. Thayer Co., 115 N.L.R.B. 1591, 1605-06 (1956) (dissenting opinion). But sanctions other than discharge — criminal prosecutions,[12] civil suits,[13] union unfair labor practice proceedings[14] and the possibility of discharge — are available to prevent or remedy certain employee misconduct. Hart & Pritchard, The Fansteel Case: Employee Misconduct and the Remedial Powers of the National Labor Relations Board, 52 Harv.L. Rev. 1275, 1319 (1939). See also Berkshire Knitting Mills, 46 N.L.R.B. 955, 1001-03 (1943), enforced, Berkshire Knitting Mills v. National Labor Relations Board, 139 F.2d 134 (3d Cir. 1943), cert. denied, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579 (1944). Hence automatic denial of reinstatement prevents the Board from protecting the rights of employees, but may not be essential to the protection of legitimate interests of employers and the public. We conclude that the teaching of the Thayer case is sound and must be followed in order to assure the Board's compliance with the statutory command that its remedial orders effectuate the policies of the Act.
 
 
 14
 The record indicates that the Board disregarded the Thayer doctrine.[15] Despite exceptions taken by both the Union and the general counsel to the trial examiner's express refusal to follow Thayer, the Board's decision refers neither to the doctrine nor to the considerations it requires. On the contrary, the Board held that strikers who did not themselves obstruct applicants but were present at the employment office picketing could not be reinstated because they were engaged in unprotected activity.[16] That approach to formulating the remedy for an employer's antecedent unfair labor practice was specifically disapproved by Thayer.[17] In ordering the Board to reconsider its determination not to reinstate certain employees who had engaged in unprotected acts of misconduct, the Thayer court reasoned that where the issue is simply whether a discharge was an attempt to coerce employees in the exercise of their rights under § 7, a finding that an employee was fired for participation in unprotected activity ends the inquiry; but where there has been an antecedent employer unfair labor practice, a finding that employees have engaged in unprotected activity is only the first step in determining whether reinstatement is appropriate.[18] We think that view of the Board's remedial powers is correct. See National Labor Relations Board v. Thayer Co., supra; Republic Steel Corp. v. National Labor Relations Board, 107 F.2d 472, 479-480 (3d Cir. 1939), modified on other grounds, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940); National Labor Relations Board v. Deena Artware, Inc., 198 F.2d 645 (6th Cir. 1952), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); National Labor Relations Board v. Stackpole Carbon Co., 105 F.2d 167, 176 (3d Cir. 1939), cert. denied, 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506 (1939); National Labor Relations Board v. Elkland Leather Co., 114 F.2d 221 (3d Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 170, 85 L.Ed. 457 (1940); National Labor Relations Board v. Anchor Rome Mills, 228 F.2d 775 (5th Cir. 1956).[19]
 
 
 15
 C. Application of the Discharge "for cause" provision of § 10(c).
 
 
 16
 In its brief and argument before this court, the Board urges that balancing union and employer misconduct is unnecessary here since § 10(c) precludes reinstatement of employees "discharged for cause."[20] It now contends that the acts of misconduct which it found were committed by the discharged employees constituted "cause." But in its decision the Board did not mention the "for cause" provision of § 10(c). Nor did it allude to factors which may be relevant considerations under that provision, such as the employer's unfair labor practices,[21] each employee's job history, and the relationship between the acts of misconduct and fitness for continued service.[22] Thus it clearly appears that the Board did not rely on § 10(c) in refusing reinstatement.
 
 
 17
 Ordinarily "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," Securities & Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). We could sustain the Board's order upon a ground which it did not consider only if that ground were one "within the power of * * * appellate court to formulate."[23] Clearly, whether these employees' misconduct constituted "cause" for discharge under § 10(c) — like the question whether death arose out of and in the course of employment under the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq. — is governed by "standards [which] are not so severable from the experience of industry nor of such a nature as to be peculiarly appropriate for independent judicial ascertainment as [a] `questions of law.'"[24] That determination lies within the special competence of the Board.[25] The Board failed to make it and we cannot supply it. Therefore, we cannot say that § 10(c) would prevent the Board from ordering reinstatement if it were to find that to do so would effectuate the policies of the Act.
 
 
 18
 D. The Board's Determination that Kohler Bargained in Good Faith during the 1954 Negotiations.
 
 
 19
 The Union's second contention, mentioned earlier, is that the Board's finding that Kohler bargained in good faith during the 1954 negotiations cannot be sustained because in making that determination the Board viewed the negotiations in isolation, ignoring the Company's pre-1953 history of anti-union activities and three unfair labor practices committed during the negotiations. We think that contention is sound.
 
 
 20
 1. The Board's finding that the successful negotiations in 1953 obviated consideration of Kohler's prior labor history.
 
 
 21
 The Board admitted that Kohler's pre-1953 attempts to prevent an independent union from gaining a foothold "could well lead to a finding * * * that * * * [Kohler] was opposed to bargaining with any but a dominated union, and was particularly opposed to bargaining with the Charging Party." But the Board found that these inferences were "refuted" by Kohler's subsequent conduct. The Company signed a contract with Local 833 after fifteen months of negotiation, the issuing of an unfair labor practice complaint, and the setting of a strike deadline. Although, as the trial examiner pointed out, "one may question whether the Union * * * was particularly enamored with the * * * contract * * *," a report in the Union newspaper described it in laudatory terms. Seven months after the contract was signed and after three months' negotiation and the fixing of another strike deadline, the Company granted a three-cent increase under the 1953 contract's wage reopening clause. "It [was] * * against this background of two successful series of negotiations that the Board [viewed] * * * the 1954 negotiations."
 
 
 22
 We need not determine whether, viewed in isolation, the negotiations would support the Board's conclusion. We conclude that in the circumstances of this case, the Board improperly ignored the inferences to be drawn from Kohler's pre-1953 labor relations history in assessing its intent at the bargaining table in 1954.
 
 
 23
 "A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination." National Labor Relations Board v. Truitt Mfg. Co., 351 U.S. 149, 155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956) (concurring opinion of Frankfurter, J.). Only compelling circumstances could justify disregarding the "antecedent" events in this record — repeated unlawful interference with employees' attempts to organize an independent union and public expressions of hostility to it. Here, the Board relies upon the lengthy 1953 contract and wage negotiations to prove that Kohler had had a change of heart and decided to accept its obligations under the statute. But the course of these negotiations shows Kohler's resistance to the Union's demands was so great that it could be overcome only by calling a strike and filing an unfair labor practice charge. While adamant resistance is not inconsistent with good faith bargaining, neither are negotiations characterized by such resistance compelling evidence of a change of heart which warrants a disregard of prior history.[26]
 
 
 24
 But we need not decide whether the successful 1953 negotiations, standing alone, could provide a proper basis for ignoring past history. They do not stand alone. Kohler committed three unfair labor practices designed to frustrate the operation of the grievance procedure created by the very contract which resulted from those negotiations and which the Board relied upon to demonstrate that Kohler had taken a new outlook. These violations included two attempts to prevent the Union's chief steward from presenting grievances[27] and a refusal to supply information needed to process wage claims based upon the three-cent increase negotiated in August 1953.[28]
 
 
 25
 Negotiation of grievances is part and parcel of the bargaining process because a collective bargaining agreement does not define all the rights and obligations of the employees and the employer. It is "a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards * * * and some do little more than leave problems to future consideration with an expression of hope and good faith." Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999, 1005 (1955). The parties anticipate that disputes will arise over the proper application of the standards spelled out in the contract and that unforeseen problems, not contemplated by the standards, will have to be resolved through negotiation.[29] For the adjustment of such matters, collective agreements establish grievance machinery. Its proper functioning is essential if the employees are to receive the benefits promised in the contract because it establishes "the autonomous rule of law" that assures that "disputes will be adjusted by reason guided by the light of the contract, rather than by force or fiat."[30] Clearly, the signing of a contract is only an initial step in the process of good faith bargaining. In light of Kohler's failure to maintain the integrity of that process, we think the 1953 negotiations do not constitute compelling reasons for disregarding "antecedent events."
 
 
 26
 We do not, of course, purport to assess the weight to be accorded these events. That is the Board's task.
 
 
 27
 IV. Conclusion and the Board's Petition for Enforcement in No. 16031
 
 
 28
 Since we find the Board's order directing Kohler to take affirmative action and to refrain from engaging in enumerated unfair labor practices is supported by substantial evidence, the Board's petition for enforcement will be granted. So much of its order as denies reinstatement to seventy-seven discharged employees will be set aside and the case remanded for further proceedings in light of this opinion and for modification of the Board's order if necessary. Any order of the Board entered pursuant to our remand will be reviewable or enforceable, as the case may be, on petition to this court, in which event the record contained in the joint appendix in the present case may be used without reprinting on the request of any party.
 
 
 29
 So Ordered.
 
 
 
 Notes:
 
 
 [1]
 The order also directs the Company to offer strikers, who were discriminatorily evicted from Company-owned houses during the strike, immediate occupancy of the same or substantially equivalent premises; furnish the Union with incentive wage information; cease and desist from committing certain enumerated unfair labor practices; and post appropriate notices in its plant
 
 
 [2]
 Kohler contends,inter alia, that the Board should have dismissed the complaint on the ground that the UAW is not in compliance with Labor Management Relations Act (Taft-Hartley Act) § 101, 61 Stat. 146 (1947), because its trustees, who Kohler claims are "officers," have not filed non-Communist affidavits, 29 U.S.C.A. § 159(h). We think this contention is laid to rest by National Labor Relations Board v. Coca-Cola Bottling Co., 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285 (1956), and National Labor Relations Board v. Appleton Electric Co., No. 13244, 296 F.2d 202 (7th Cir., Nov. 15, 1961).
 
 
 [3]
 National Labor Relations Act § 10(c), 49 Stat. 454 (1935), 29 U.S.C.A. § 160 (c)
 
 
 [4]
 See also National Labor Relations Board v. Kelco Corp., 178 F.2d 578 (4th Cir. 1949)
 
 
 [5]
 See Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); National Labor Relations Board v. National Shirt Shops, 212 F.2d 491, 494 (5th Cir. 1954)
 
 
 [6]
 We assume without deciding that Thayer principles would not govern reinstatement of employees discharged during the time, if any, before the stoppage became an unfair labor practice strike
 
 
 [7]
 The record does not show whether all or only some of the pickets were discharged
 
 
 [8]
 Some who participated in the mass picketing were also involved in these activities. They are included in the tabulation of those discharged for participation in mass picketing
 
 
 [9]
 The Union challenges the Board's reversal of the trial examiner's finding that physical presence at the home demonstrations, employment office picketing and on the mass picket line did not constitute "misconduct." That issue is discussed at note 16, infra
 The Union does not contest the Board's rejection of the condonation finding.
 
 
 [10]
 These policies are,inter alia, to "protect the right of employees to organize and bargain collectively" and to assure that labor organizations respect employer's rights and do not jeopardize the public safety. Labor Management Relations Act of 1947 (Taft-Hartley Act), § 101, 61 Stat. 136, 29 U.S.C.A. § 141 et seq.; National Labor Relations Act, § 1 et seq., 49 Stat. 449 (1935), as amended, 29 U.S. C.A. § 151 et seq.
 Cf. Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 278-280, 284, 76 S.Ct. 349, 100 L.Ed. 309 (1956).
 
 
 [11]
 See Cox, The Right to Engage in Concerted Activities, 26 Ind.L.Rev. 319, 324 n. 24 (1951)
 
 
 [12]
 See United Auto, Aircraft and Agr. Implement Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 268, 272-274, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); Apex Hosiery Co. v. Leader, 310 U.S. 469, 483, 513, 60 S. Ct. 982, 84 L.Ed. 1311 (1939)
 
 
 [13]
 United Const. Workers, Affiliated With United Mine Workers of America v. Laburnum Corp., 347 U.S. 656, 657, 74 S.Ct. 833, 98 L.Ed. 1025 (1954); International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); Youngdahl v. Rainfair, Inc., 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957)
 
 
 [14]
 Labor-Management Relations Act of 1957 (Taft-Hartley Act), § 101, 61 Stat. 141, 29 U.S.C.A. § 158(b). See, e. g., United Auto, Aircraft and Agr. Implement Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 270-271, 76 S.Ct. 794, 100 L.Ed. 1162 (1955)
 
 
 [15]
 It would also appear from the Board's action on the Thayer remand that it did not intend to follow that decision in the future. See H. N. Thayer Co., 115 N.L.R.B. 1591, 1595 (1956)
 
 
 [16]
 The Union attacks this finding, citing,inter alia, International Ladies' Garment Workers Union v. National Labor Relations Board, 99 U.S.App.D.C. 64, 237 F. 2d 545 (1956). In that case, we held that the Board erred in imputing the misconduct of some employees on the picket line to other employees who were present but who did not participate in acts of misconduct. We express no opinion concerning the applicability of that case to the facts of the present case. We assume that on the remand in this case the Board will consider it in assessing the seriousness of the misconduct.
 
 
 [17]
 213 F.2d at 753
 
 
 [18]
 The Thayer court referred to "well-behaved" picket lines in which 103 employees had participated and for which they had been discharged. Since peaceful picketing is protected activity, the court upheld the Board's reinstatement of these employees. But the court also directed the Board to reconsider its refusal to reinstate certain other employees who had engaged in admittedly unprotected acts of misconduct. It is this portion of the Thayer opinion, to which the character of the picket lines is not relevant, which we follow here
 
 
 [19]
 Compare Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1955), with Arlan's Department Store, 133 N.L. R.B. No. 56 (Oct. 10, 1961). In Mastro the Supreme Court sustained reinstatement of employees who struck in response to their employer's "flagrant" unfair labor practices, even though the collective bargaining agreement contained a "no-strike" clause. In Arlan, the Board denied reinstatement under similar circumstances because the employer's unfair labor practices were not serious. Explaining its refusal woodenly to apply Mastro, the Board said:
 "The `either or' or `slot machine' theory of jurisprudence cannot be applied to labor relations. In this field lines between the licit and illicit can rarely be drawn clearly in advance. And in the penumbral areas which are omnipresent, there is no substitute for niceties in judgment. As the Supreme Court recently observed in [Local 761, Intern. Union of Elec. Radio and Machine Workers] Electrical Works v. N. L. R. B., 366 U.S. 667, 674 [81 S.Ct. 1285, 6 L.Ed.2d 592]. `However difficult the drawing of lines more nice than obvious, the statute compels the task.'" [133 N.L.R.B. No. 56 at p. 7.]
 We think these considerations apply with equal vigor to our case where, as in Arlan, both sides have been at fault.
 
 
 [20]
 Section 10(c) provides: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." Labor Management Relations Act of 1947 (Taft-Hartley Act), § 101, 61 Stat. 147 (1947), amending National Labor Relations Act, § 10 (c), 49 Stat. 454 (1935), 29 U.S.C.A. § 160(c)
 
 
 [21]
 Brief for the National Labor Relations Board in Opposition to Certiorari in Thayer Co. v. National Labor Relations Board, 348 U.S. 883, 75 S.Ct. 123, 99 L. Ed. 694 (1954), pp. 21-22
 
 
 [22]
 See Note, 32 N.Y.U.L.Rev. 839, 846-48 (1957); National Labor Relations Board v. Illinois Tool Works, 153 F.2d 811 (7th Cir. 1956); National Labor Relations Board v. Kelco Corp., 178 F.2d 578, 582 (4th Cir. 1949). Cf. Westinghouse Electric Corp., 26 Lab.Arb. 836 (1956); Southern Bell Tel. & Tel. Co., 25 Lab.Arb. 85 (1955); Southern Bell Tel. & Tel. Co., 26 Lab.Arb. 515, 517 (1956); Southern Bell Tel. & Tel. Co., 26 Lab.Arb. 29 (1956); Lehigh Portland Cement Co., 34 Lab.Arb. 866 (1960); Appleton Electric Co., 28 Lab.Arb. 249 (1957); Glasgow Adrian Co., 25 Lab.Arb. 614 (1955); Reynolds Metals Co., 25 Lab.Arb. 405 (1955)
 
 
 [23]
 Chae-Sik Lee v. Kennedy, 111 U.S.App. D.C. 35, 294 F.2d 231, 234 (1961), citing Securities & Exchange Comm'n v. Chenery Corp., supra at 88, of 318 U.S., 63 S.Ct. 454. See National Labor Relations Board v. Lundy Mfg. Co., 286 F. 2d 424 (2d Cir. 1960)
 
 
 [24]
 O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 507-508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951)
 
 
 [25]
 93 Cong.Rec. 6677-78 (1947) (remarks of Sen. Taft). Cf. O'Leary v. Brown-Pacific-Maxon, Inc., supra note 23; Swift & Co. v. United States, 316 U.S. 216, 62 S.Ct. 948, 86 L.Ed. 1391 (1942); Allegheny Corp. v. Breswick & Co., 353 U.S. 151, 163-170, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957)
 See generally 4 Davis, Administrative Law § 30.03 (1958).
 
 
 [26]
 Cf. National Labor Relations Board v. Tower Hosiery Mills, Inc., 180 F.2d 701 (4th Cir.), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596 (1950); Fetzer Television, Inc., 131 N.L.R.B. No. 113 (May 29, 1961); Fitzgerald Mills Corp., 133 N.L.R.B. No. 98 (Oct. 11, 1961)
 
 
 [27]
 One attempt involved coercion, the other an offer of a reward
 
 
 [28]
 In discussing Kohler's coercion of the Union's shop steward, the Board did not say whether these actions reflected upon the Company's good faith during the 1954 pre-strike negotiations then in progress. Similarly, the Board found that Kohler's unlawful refusals to supply information — some of which the Union needed to formulate its incentive wage demands — did not provoke the 1954 strike or impede the negotiations which preceded it. But the Board again failed to say whether the refusals revealed a hostility to the Union which motivated Kohler's relatively inflexible stand at the bargaining table and thus prevented agreement. Cf. National Labor Relations Board v. Booker, 180 F.2d 727 (5th Cir. 1950). If the Board failed to consider these violations in determining whether the strike was caused by Kohler's alleged "surface bargaining," see Fitzgerald Mills, Inc., 133 N.L.R.B. No. 98 (Oct. 11, 1961), the Board will have an opportunity to do so upon remand of these cases
 
 
 [29]
 Id. at 1003-07
 
 
 [30]
 Id. at 1007
 
 
 
 30
 WILBUR K. MILLER, Chief Judge (dissenting).
 
 
 31
 The strike at the Kohler plants, which the Union began April 5, 1954, was still in progress on August 26, 1960, when the Board entered the order which is now before us on the parties' petitions for review and the Board's petition for enforcement. The fact that unlawful mass picketing and acts of violence immediately began is shown by the following quotation from the Board's decision and order:
 
 
 32
 "From April 5 until May 28, 1954, except for 3 days early in May, Respondent's plant was `SHUT DOWN LIKE A DRUM' by the mass picketing of up to 2,500 pickets.* The pickets stationed in front of the Respondent's plant moved in a double line along the sidewalk across the driveways and plant entrances, in both directions for 2 city blocks. In addition to the main picket line, another group of pickets formed in the roadway to meet groups of nonstrikers who approached the picket line to enter the plant. This advance guard, on a number of occasions, would physically block, push, shove, and prevent the nonstrikers from entering the plant. In addition, when nonstrikers approached the plant entrances, the double line of pickets would close any space in the line, and engage in conduct that has been commonly called `belly to back' picketing while the advance guard was attempting to prevent the nonstrikers from even reaching the picket line. Those other entrances to the plant not affected by the above described picketing, were also barred, and while the picketing at those gates was not conducted on the grand scale described above, it was nevertheless effective in preventing ingress to or egress from the plant. In many instances the pickets refused to permit entrance to the plant property despite requests of the police to let the workers into the plant, and on those occasions when nonstrikers were attempting to enter the plant the pickets yelled and shouted such things as `Hold the line,' `No one gets through,' and `Go home scab, go home.'
 
 
 33
 "In addition to the foregoing, the Union also put into effect and maintained during this period a `pass' system under which persons desirous of entering the plant, the main office, the employment office, or even the medical department were required to procure passes from the Union's strike headquarters some distance away.**"
 
 
 34
 An order of the Wisconsin Employment Relation Board, entered May 21, 1954, prohibited this unlawful mass picketing and other illegal conduct of the Union. When a proceeding to enforce that order was begun, the Union agreed on May 28 to comply with it. Kohler had refused to negotiate during the mass picketing, but negotiations were resumed June 1, 1954, pursuant to the Union's agreement to discontinue its unlawful practices. But on June 29, Kohler again broke off negotiations, and in his report the trial examiner found its action was justified by continued violence and vandalism for which the Union was responsible. In its decision and order the Board concurred.
 
 
 35
 In August, 1954, negotiations were resumed but were soon discontinued by Kohler because the homes of non-striking employees were being "picketed" in what the trial examiner called "disgraceful spectacles of mob proportions." I quote from the examiner's "concluding findings":
 
 
 36
 "The evidence plainly justifies Respondent's assertion that the Union was encouraging the home demonstrations. The conduct involved was sufficiently serious to warrant Respondent in suspending negotiations while the conduct continued. Certainly, the demonstrations, which had become widespread and which had reached scandalous proportions, constituted coercion and intimidation of nonstriking employees of the most flagrant type. It is therefore concluded and found that Respondent was justified in breaking off negotiations on August 18."
 
 
 37
 Although the trial examiner found "the Union was encouraging the home demonstrations," — an understatement, I think — he held there was no evidence that any striker participated in those mob scenes at the direction or suggestion of the Union, and that certain of the dischargees who were present were discriminatorily discharged. But a majority of the Board held "the Respondent [Kohler] had a valid ground for discharging all those strikers who were identified as being present at the home demonstrations." Proceedings to enforce the Wisconsin Board's order, which also prohibited home picketing, were begun and as a result such conduct by the Union was enjoined on August 30. This ended the home picketing.
 
 
 38
 The next acts of violence were in the employment office picketing which occurred in December, 1954, and January, 1955. This activity was thus described by the Board:
 
 
 39
 "The Respondent also relied on participation in the employment office picketing as a grounds for the discharge of some of the strikers now in issue. The employment office picketing occurred generally in December 1954 and January 1955. The scene of this picketing was the entrance to the employment office and the approaches to that entrance. The pickets, usually numbering from 15 to 25, normally did not form a picket line as such, but assembled in groups along the sidewalk in front of the employment office. On occasion, when the job applicants approached to enter the employment office building, some of the pickets, and on occasion all of the pickets, would interpose themselves between the approaching applicants and the entrance to the employment office. In many such instances the applicants either had to push their way through the pickets or walk around them, but in the latter event the pickets sometimes again shifted to interpose themselves between the applicant and the door. On many occasions the applicants could not make their way into the employment office until the Kohler Village Police came over and ordered the pickets to open up. Frequently there were instances when groups of pickets actively blocked, pushed, shoved, bumped, spat upon, tripped, kicked, and otherwise impeded the entrance of persons into the employment office.
 
 
 40
 * * * * * *
 
 
 41
 "Chairman Leedom and Members Rodgers and Jenkins, constituting a majority of the Board, find that where it has been shown on the record that the dischargees were present at those employment office incidents, the Respondent had valid grounds for discharging them. * * *"
 
 
 42
 On March 1, 1955, Kohler discharged 90 strikers because of misconduct in connection with the strike. In the General Counsel's complaint against Kohler, which initiated the case before us, he alleged that 78 of them had been discharged because of their union membership or activities or because they had otherwise engaged in concerted activities. But the Board found that these strikers were lawfully discharged because they had participated in and actively supported unlawful activities which intimidated nonstrikers in the exercise of their legal rights.[1]
 
 
 43
 The Board found, however, on the basis of incidents relatively insignificant in comparison with the strikers' unlawful behavior, that Kohler had refused to bargain collectively with the Union, that it had discouraged union membership, and had engaged in other unfair labor practices. It ordered Kohler to bargain collectively with the Union, to furnish it with information concerning incentive earnings, and to offer all striking employees (except those found by the Board to have been lawfully discharged and except those who had been permanently replaced prior to June 1, 1954,[2]) immediate and full reinstatement to their former positions, and to make them "whole * * for any loss of earnings which they may suffer by reason of Respondent's [Kohler's] refusal, if any, to reinstate them * * *." The Board also ordered Kohler to offer certain striking employees, who had been evicted from living quarters owned by Kohler, immediate occupancy of their former quarters and to make them whole for any loss they might have suffered by reason of eviction.
 
 
 44
 In case No. 15,961, the Union seeks review of the portion of the Board's order which held the 78 dischargees had been lawfully discharged. It argues that the case should be remanded to the Board to determine whether reinstatement of the discharged strikers would effectuate the policies of the Act. Although Section 10(c) of the Act, 29 U.S.C.A. § 160(c), provides:
 
 
 45
 "* * * No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged * * * if such individual was suspended or discharged for cause. * * *",
 
 
 46
 the Union contends the conduct of the discharged strikers should be compared with alleged unfair practices on the part of Kohler — in a sort of balancing of equities, I suppose; that, having made such comparison, the Board should determine whether reinstatement of the discharged strikers would effectuate the policies of the Act and, if it so determined, should order their reinstatement, despite the flat provision of Section 10(c).
 
 
 47
 In their opinion, the majority of the Court accept the Union's argument, and set aside "So much of its [the Board's] order as denies reinstatement to seventy-seven discharged employees[3] * * *" and remand the case to the Board for further proceedings. Among the bases for this ruling, my brothers cite National Labor Relations Board v. Thayer Co.,[4] saying, "* * * [T]hat view of the Board's remedial powers is correct." The majority disregard Section 10(c) of the Act because, they say, "* * * [I]n its decision the Board did not mention the `for cause' provision of § 10(c). * * * Thus it clearly appears that the Board did not rely on § 10(c) in refusing reinstatement."
 
 
 48
 I disagree. I do not think Section 10 (c) can be disregarded in this fashion. And I do not read the Thayer opinion as support for the majority's decision. The facts are quite different. In the Thayer case 103 discharged strikers were ordered by the Board to be reinstated. The court said:
 
 
 49
 "* * * It is undisputed that those employees who wished to continue working during the strike were able to do so. The Board and the trial examiner both drew the `factual inference' that the pickets did not intend or seek to prevent employees from entering or leaving the plants.[5] There is substantial evidence on the whole record to support this finding. * * *"
 
 
 50
 In addition, in another place in its opinion, the Thayer court said, "The picket lines were fairly well-behaved, and non-striking employees were able to enter and leave the plants without serious incident." It is apparent, therefore, that the Board did not find in the Thayer case, as it did here, that the strikers were guilty of unlawful violent conduct which was, as the majority say of this Union's conduct, typical of "a bygone era." Thus cause for discharge did not clearly appear, as it does here. There are some observations in the Thayer opinion as to the Board's duty to determine whether reinstatement would effectuate the legislative purpose in cases where cause for discharge did not appear. I do not regard those observations as persuasive; but, if they are sound, they have no application in a case such as this where cause for the discharges so clearly appears.
 
 
 51
 Moreover, the Thayer court did not leave Section 10(c) out of consideration because the Board had not relied upon it, as do the majority in this case. It said, "The actual questions in this case are whether under the circumstances the strike conduct was cause for discharge, and if not whether reinstatement would effectuate the policies of the Act." (My emphasis.) This is a clear statement, I think, that if there was cause for discharge, the Board could not reinstate and, therefore, could not consider the question whether reinstatement would effectuate the legislative policies. It is also a clear recognition of the efficacy of the "just cause" provision of Section 10(c).
 
 
 52
 The strike which began April 5, 1954, was caused, the Board found, by a disagreement over contract terms, and not by Kohler's refusal to bargain which the Union alleged. But the Board also found that the strike was prolonged by Kohler's unilateral grant of a three-cent wage increase, which it said occurred June 1, 1954. Thus, after that date the continuance of the strike was held to be due to this alleged unfair labor practice on the part of Kohler. This is the significance of the date of June 1, 1954, which I promised in footnote 2 I would explain.
 
 
 53
 I do not think the Board had the right to make this finding. The complaint alleged and Kohler's answer admitted that the wage increase was put into effect on April 5, so there was no issue as to the date presented for decision. But, having found the strike was begun on April 5, without fault on Kohler's part, the Board said a unilaterally granted wage increase of three cents "disparaged the Union and the collective bargaining process, and clearly falls within the proscription of Section 8(a) (5) and (1) of the Act." This was held to convert the economic strike into an unfair labor practices strike.
 
 
 54
 Even if this small increase had been put into effect on June 1, 1954, it could not justly and fairly be regarded as disparaging the Union and the collective bargaining process, in my opinion. The notion that the Union was ready on June 1, 1954, to settle the strike which began April 5, but was forced to prolong it by the unilateral grant of a three-cent wage increase on that day seems to me to be rather farfetched, — indeed, without foundation in reason.
 
 
 55
 The majority opinion does not discuss case No. 16,182, which is Kohler's petition for review. This omission is due, I suppose, to the fact that case No. 16,031 — the Board's petition for enforcement — which is discussed by the majority, is largely the reverse of Kohler's petition for review.
 
 
 56
 On the basis of matters which I regard as trivia — feeble efforts of Kohler to protect itself against open warfare — the Board's order went largely against the employer. In ordering its enforcement, the majority opinion goes even further. I do not believe any purpose would be served by a detailed discussion of subjects not heretofore treated in this dissent; suffice it to say I disagree with the majority opinion. Its refinements of reasoning do not impress me as sufficient to justify its reward of the Union for unconscionable conduct. I would deny enforcement in No. 16,031, deny the Union's petition in No. 15,961, and grant the request of Kohler's petition for review in No. 16,182.
 
 
 
 Notes:
 
 
 *
 "In its radio broadcast of April 19, the Union boasted that some 2,500 pickets walked in a double picket line extending for 2 blocks in front of the Respondent's plant
 
 
 **
 "Apart from those persons who obtained passes from the Union, only the office employees and supervisors were permitted to enter the plant property during the above-described period."
 
 
 [1]
 Section 8(b) (1) (A) of the Act, 29 U.S. C.A. § 158(b) (1) (A), provides that
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * *."
 
 
 [2]
 The significance of this date will be noted later
 
 
 [3]
 Whether this figure should be 77 or 78, I do not know
 
 
 [4]
 213 F.2d 748 (1st Cir. 1954)
 
 
 [5]
 According to the Board, it was peaceful picketing