**ONEITA KNITTING MILLS, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 10169.**

United States Court of Appeals
Fourth Circuit.

Argued Feb. 8, 1966.

Decided March 6, 1967.

387

Wm. H. Smith, Jr., Columbia, S. C. (E. D. Smith, Jr., Columbia, S. C., on brief), for petitioner.

Elliott G. Lichtman, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., National Labor Relations Board, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge:

Oneita Knitting Mills, Inc., (hereafter Oneita) asks review of an order of the National Labor Relations Board (hereafter Board) ordering Oneita to cease and desist from unfair labor practices in violation of section 8(a) (5), (3) and (1) of the National Labor Relations Act and to restore certain employees to their former positions with seniority and to reinstate discharged employees. The customary backpay remedy was also prescribed by the Board.

The Board, expressly adopting the Examiner's recommendation, found that Oneita had violated section 8(a) (5), (3) and (1) of the Act by changing the terms and conditions of employment of twenty-one returning strikers. The Board also ordered the reinstatement of eighteen additional employees discharged by Oneita for their misconduct during the course of the strike. We order enforcement of the Board's order with respect to the section 8(a) (5), (3) and (1) violations and, as hereinafter explained, enforce the reinstatement order with respect to some of the employees discharged for misconduct, denying reinstatement with respect to others.

Oneita is a New York corporation engaged in the manufacture of men's underwear at Andrews, South Carolina. The International Ladies' Garment Workers' Union, AFL–CIO, Local 371 (hereafter Union) has been the recognized collective bargaining agent of Oneita's employees at the Andrews plant for some years. At the expiration of the contract on July 10, 1963, the employees went out on strike. The Board, in an earlier decision,[1] found that the strike was caused and prolonged by Oneita's refusal to bargain on mandatory subjects in violation of section 8(a) (5) and (1) of the Act. The strike continued until February 4, 1964, at which time most of the employees returned to work at their former jobs. However, sixteen female employees, who formerly worked as knitters, were assigned new jobs in different departments, in total disregard of the seniority they had accumulated in the knitting department. These employees refused to return to work under such an arrangement. Five other employees returned to work but were no longer assigned "sew band" work, a particular task for which the employees were paid on a piece-work basis, and at which they felt they could earn more money. Eighteen other employees were refused reinstatement because Oneita determined that they had been guilty of such miscon-

1. 150 NLRB 54, 58 LRRM 1136.

duct during the strike that, under section 10(c) of the Act, Oneita could legally and justifiably refuse them reinstatement.[2]

 We initially consider the changes in the working conditions of the twenty-one employees who could have returned to work. These employees fall into two classes. First, there are the sixteen female knitters who, upon offering to resume work, were assigned to different jobs. The record revealed that Oneita did not discuss such changes with the Union. By way of justification, Oneita claimed that it had decided in 1962 to replace the female employees with male employees because men could perform the relatively arduous duties attending this job with greater facility and fewer injuries. It further argues that the females were offered substantially equivalent employment. However, the knitters, if placed in new jobs, would lose the seniority they had accumulated in their former positions and would be at the bottom of the seniority list for layoff and promotional purposes. Since seniority has a vital impact on "terms and conditions of employment" it is a mandatory subject of bargaining.[3] The mere fact that the collective bargaining agreement which spawned the seniority rights had expired could not justify a unilateral change of these rights and the Union should have had an opportunity to meet with and discuss such changes with Oneita.[4] Therefore, the effect of the work transfers on the seniority rights made such transfers a mandatory subject of bargaining. Oneita's argument that the knitters never found out what their seniority rights would be in their new jobs and that they adamantly refused *any* job is of no moment here. This is precisely the reason why Oneita is under a

duty to negotiate with respect to such changes *before* they are made effective. Oneita cannot commit an unfair labor practice and then complain of Union recalcitrance which such practice is sure to engender. The policy underlying the Act does not permit such circular reasoning.

 The Examiner and the Board found also that the replacing of the female knitters was discriminatory and coercive and as such violated section 8 (a) (3) and (1) of the Act. As stated above Oneita asserted that the change to male knitters had long been contemplated because it was more economical. The record shows that Oneita, claiming to have acted pursuant to its plan, had hired two male knitters, but upon Union objection agreed to hire no additional men and permit the gradual elimination of the women by attrition. But the record also shows that Oneita hired a rather diminutive female only a short time prior to the strike—a fact which seems to belie Oneita's suggestion that it had reached a decision to effect the plan at the time claimed. This fact coupled with the timing of the changes—immediately after the strike—furnishes ample support for the Board's conclusion that such changes were discriminatory and coercive. If there is substantial evidence on the record as a whole to support the Board then the court will accept the Board's findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

 We next consider the reassignments of the "sew band" operators. Five employees who, because of their seniority, had devoted three days per month to such work, were no longer assigned this work

---

2. The relevant portion of section 10(c) states:

"* * * No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. * * * "

3. NLRB v. Northwestern Publishing Co., 343 F.2d 521 (7 Cir. 1965); Industrial Union of Marine and Shipbuilding Workers of America v. NLRB, 320 F.2d 615 (3 Cir. 1963); NLRB v. Proof Co., 242 F.2d 560 (7 Cir. 1957); NLRB v. Century Cement Mfg. Co., 208 F.2d 84 (2 Cir. 1953).

4. Industrial Union of Marine and Shipbuilding Workers of America v. NLRB, 320 F.2d 615 at 621.

after the strike.[5] The work, which had been previously assigned exclusively on the basis of seniority, was no longer so assigned. Employees with less seniority, at first all nonstrikers, were assigned the "sew band" work.

Here again Oneita instituted operational changes which affected seniority rights without giving the Union an opportunity to state its position and to bargain concerning such changes. Such operational changes resulting in a transfer of work within the plant affect the "conditions of employment" and as such cannot be undertaken unilaterally. NLRB v. Northwestern Publishing Co., 343 F.2d 521, 526 (7 Cir. 1965). Oneita's reliance on Jays Foods, Inc. v. NLRB, 292 F.2d 317 (7 Cir. 1961), is misplaced. In *Jays Foods, Inc.*, the unilateral change involved a complete abolition of a department. In the instant case Oneita has not abandoned the sew band work but has undertaken to alter the basis upon which it selects employees to do such work.[6]

██ The Board also affirmed the Trial Examiner's finding that Oneita, in removing the five returning strikers from the sew band operation, violated section 8(a) (3) and (1) of the Act. As pointed out above, subsequent to the end of the strike this work was assigned to either nonstrikers or those who had abandoned the strike at an early stage. This fact when considered in relation to the timing of the change—immediately after return to work—provided substantial evidence to support the Board's conclusion that Oneita violated section 8(a) (3) and (1) of the Act. Since Oneita assigned no logical reason for the change it is a fair inference that it was motivated by a desire to retaliate against the strikers for past transgressions and to chill union fervor in the future.

Therefore we affirm the Board's findings with respect to the sew band operators.

We next consider that aspect of the Board's decision which ordered reinstatement of eighteen striking employees to whom Oneita had refused reinstatement because of their involvement in various acts of misconduct. The Examiner explained that he was proceeding on the theory that since the strike was a protest against an employer unfair labor practice he should and would apply a modified and less stringent standard in considering the asserted misconduct of the strikers and would take into account such unfair labor practice as a mitigating circumstance. His announced intention was, in essence, to apply a balancing test based primarily upon the decision of the First Circuit in N. L. R. B. v. Thayer Co., 213 F.2d 748, cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954).

Prior to *Thayer* this court had occasion to consider unfair labor practice strikers' misconduct asserted by their employers in justification of refusals of reinstatement. In N. L. R. B. v. Kelco Corp., 178 F.2d 578 (4 Cir. 1949), the late Chief Judge Parker, in writing for this court, held that *violence and intimidation of a serious character* must be considered by the Board in determining justification for refusing to reinstate such strikers. There the misconduct was "ganging up on a non-striking employee and chasing him to his home in one case, knocking down an employee and beating him publicly in the other." 178 F.2d 582. Rejected was the Board's theory that criminal convictions on the charges of misconduct were necessary to justify the employer's denial of reinstatement.

In N. L. R. B. v. Longview Furniture Co., 206 F.2d 274 (4 Cir. 1953), this

---

5. These women employees were assigned to machines which did not have the attachment necessary to the performance of this operation.

6. Oneita's argument that the impact on the workers was insignificant and slight seems unrealistic in view of the fact that seniority was the sole basis for selection of those to do the work—an indication that the work was highly desirable. At any rate the Union felt that the effect of the changes was significant and since seniority is so interwoven with assignment of these jobs the changes were a mandatory subject of bargaining.

court amplified its decision in *Kelco*. It held that reinstatement is not to be denied "because of ordinary incidents of the maintenance of a picket line or for the use of rude language arising out of the feelings thereby aroused." 206 F.2d at 275. However, this court found no justification for acts flowing from "animal exuberance" and further held that the Act did not protect "employees who have banded together in hurling profane, obscene and insulting epithets at employees who are attempting to work, in an effort to degrade and humiliate them publicly and prevent their working." 206 F.2d at 275.

▊ Thus, holdings of this court preclude the unfair labor practice employer from pointing to trivial incidents and the use of obscene and insulting language, spontaneously and in isolated instances, as justification for a refusal to offer reinstatement at the termination of the strike. If the employer were permitted to pursue such a course he would, in many instances, derive a benefit from his own illegal activity. The policy of the National Labor Relations Act is to foster and encourage industrial harmony and it is to this end that Congress has proscribed certain activities as unfair labor practices. The deterrent effect of this policy would be seriously undermined if an employer were permitted to deny reinstatement to employees whose acts of mischief were the natural consequence of the employer's provocative violations of the Act. However, violent activity which has as its purpose the intimidation of nonstriking employees or which creates situations fraught with danger to them or to the general public can serve as the basis for an unfair labor practice employer's refusal of reinstatement. The vital policy underlying the Act does not contemplate the protection of such employees and nothing in *Thayer* supports a contrary view. The court in *Thayer* simply decided that if employee activity is otherwise unprotected under the Act the Board should balance the unfair labor practice of the employer against the misconduct of the employee.

It clearly recognized that certain activity *could* justify a denial of reinstatement and pointed out that Board determinations with respect to such activity were always subject to judicial review. 213 F.2d at 755 n. 14. The *Thayer* court did not attempt to catalog the kinds of activity which would justify a denial of reinstatement. On the contrary, the court stated that the application of such a balancing test by the Board has little value as precedent in a subsequent Labor Board case because of the nuances of fact inevitable in the later situation. The Court of Appeals for the District of Columbia Circuit in Local 833, UAW–AFL–CIO v. N. L. R. B., 112 U.S.App.D.C. 107, 300 F.2d 699 (1962), adopted the view as expressed in *Thayer* and held that the mere fact that unfair labor practice strikers engaged in unprotected activity would not justify the employer's refusal to reinstate them. However, the court there reversed the decision of the Board for failing to apply *Thayer* (300 F.2d 703), and remanded the case with directions to the Board to apply the *Thayer* balancing test in order to determine whether reinstatement would effectuate the policy of the Act.

Neither *Thayer* nor Local 833 created or undertook to apply a fixed standard. While purporting to apply a balancing test the Examiner in this case used language which clearly implies that he was applying an inflexible standard, i. e., conduct short of aggravated assault would not result in a forfeiture of the right to reinstatement. Indeed, *Thayer* cautioned that such determinations, by necessity, have little precedential authority.

▊ We cannot overlook the fact that, in response to unfair labor practices, the strikers have resorted to the use of a most powerful defensive and retaliatory weapon—the power to strike. While it is only natural to expect that such strikers will be intent upon persuading those who continue to work to join them in their protest, their persuasive efforts cannot be free of all restraints but must be circumscribed and confined within reasonable limits if such

strikers are to be protected in their right to reinstatement to their former positions to which the courts have held they are entitled.

In applying the decisions of this court as well as the above-noted decisions of the First and the District of Columbia Circuits to the incidents here in question we are in accord with the Board's general view that many of them were trivial.[7] However, we reach the conclusion that the Board erred with respect to several incidents where, in our view, the misconduct was such as to justify Oneita's refusal to reinstate certain of the strikers. In view of the Examiner's disposition of these incidents, approved by the Board, we do not feel that a remand is necessary. We simply disagree with the Board's application of the legal principles as enunciated in the decisions of this court, or in *Thayer*, and Local 833. We discuss these incidents below.

### *The McKenzie Incident of August 14*

Vivian McKenzie, a nonstriker, testified that on August 14, 1963, while driving on her way to work she was followed by a cream-colored vehicle for about one and one-half miles. As she entered town, two eggs were thrown from this car but neither struck her car. She further testified that while she did not know who threw the eggs, she observed Yvonne West in the car. West, a striker, categorically denied egg throwing. The Examiner felt that McKenzie had properly identified the vehicle and that the incident had occurred, but stated that on the strength of West's denial she (West) should be reinstated. With this conclu-

sion we disagree. Proof of West's misconduct need not be predicated on the fact that she actually threw the eggs, for in furnishing transportation for those who did she is equally culpable. See N. L. R. B. v. Longview Furniture Co., supra, 206 F.2d at 277. The following of the McKenzie vehicle in the circumstances is the type of conduct which has the effect of intimidating the nonstrikers. Engaging in the throwing of eggs or other objects at a moving automobile upon the highways is both criminal and dangerous. For these reasons the company was justified in refusing reinstatement to Yvonne West.

### *"Nine-Mile Curve" Incident*

Iva Lambert, who worked throughout the strike, testified that on August 14, 1963, she was driving several women home from work when, at a point in the road, known as the nine-mile curve, her car was struck by eggs. She identified strikers Janice Marshall Martin, Vermie Bodiford, Joan Long and Naomi McGee as the persons who threw the eggs. She stated that when she stopped to list these names Bodiford challenged her to a fight which she declined. All the strikers in question admitted their presence but denied throwing any eggs. The Trial Examiner stated that he believed the incident occurred but did not accept Lambert's testimony as to the identity of the culprits.[8] He absolved the strikers on the ground that they were provoked by an incident which occurred several days earlier. This involved the hurling of water balloons by the nonstrikers at the cars of the strikers.

---

7. These consisted of the distribution by strikers to nonstrikers of Jack London's famous poem "A Scab" which contains such ungentle references to nonstrikers and strike-breakers as Judas Iscariots and Benedict Arnolds.

 There was also an incident in which Jose Mallo, a supervisor of Cuban nationality, was the victim of obscene language, ethnic slurs and a suggestion that he return to his homeland.

 The company alleged that other incidents of a more serious nature occurred

but we cannot say that the Board's findings and conclusions as to these were in error. But cf. N. L. R. B. v. National Furniture Mfg. Co., 315 F.2d 280, 286, n. 7 (7 Cir. 1963), in which the court found that disrespectful and obscene language directed at management personnel could serve as the basis for a denial of reinstatement.

8. Discrediting of Lambert by the Examiner appears to be based in large part on her inability to immediately recall the names of *all* those present.

But the Examiner failed to mention or consider the fact that the nonstrikers were themselves provoked to such measures in order to retaliate against their constant harassment on the highways by the strikers. We reject the conclusion of the Board in this instance and find that the water-balloon incidents were, at the time of this event, too remote to provide sufficient provocation for what occurred. The Examiner's finding that those named did not participate in this incident seems of dubious validity in view of his finding that the incident occurred and the fact that the strikers named by Lambert admitted their presence. As this court pointed out in N. L. R. B. v. Longview Furniture Co., supra, those who cooperate with the offending strikers are equally culpable and likewise forfeit their right to reinstatement. 206 F.2d at 277. Therefore, Oneita was justified in refusing to reinstate Martin, Bodiford, Joan Long and Naomi McGee.

### The Linda Cannon Incident

Martin and Bodiford were also involved in another incident on the highways with nonstriker Cannon. Cannon testified that Martin and Bodiford were riding in a panel truck from which eggs and tomatoes were thrown at her (Cannon's) car. Martin pleaded guilty to reckless driving and disorderly conduct and Bodiford likewise pleaded guilty to disorderly conduct. Their fines were paid by the Union. This incident, in view of the guilty pleas, serves as an independent basis for Oneita's refusal to reinstate Martin and Bodiford despite the Examiner's conclusion that such conduct did not render them unfit for employment within the policy of the Act. The Examiner's failure to make a positive finding that Martin and Bodiford were involved seems incredible in view of their guilty pleas.

### The Glisson Incident

Eastland Glisson, who worked throughout the entire strike, testi-

fied that on several occasions her car was followed, that on one occasion strikers Yvonne West and Edna Long repeatedly drove their car in front of her car and would not permit her to pass, and that Long and West shouted obscene remarks and called her a "scab." The Examiner found the incident had taken place but did not feel it was "sufficiently grave to warrant withholding reinstatement." [9] This is a legal conclusion which we are free to accept or reject. 29 U.S.C. § 160(e). We conclude that this misconduct which was calculated to intimidate the nonstrikers and which was inherently dangerous in that it involved obstruction of the public highway, provides adequate support of the denial of reinstatement to West and Long.

### The McKenzie Gate Incident

On July 10, 1963, the first day of the strike, Vivian McKenzie and her daughter, Aloma McKenzie Potson, attempted to enter the main gate outside the plant. Pickets were patrolling this area and, according to McKenzie and Potson, the pickets blocked their path and would not step aside to permit them to enter. These two attempted to make their way through the line of pickets, Potson with her head down, in the familiar position of a fullback attempting to gain yardage. The evidence as to what followed is conflicting. Potson and McKenzie testified that they were physically restrained by strikers Hazel Brantley, Joyce High, Evelyn Collins and Willa Mae McGee. This group gave an entirely different version, claiming, in essence, that though present, they did no more than attempt to verbally dissuade Potson and McKenzie from going to work and that Potson pushed or knocked them aside. It was established that Potson's blouse was torn from her. The Examiner found that her blouse was torn but held that the truth lay somewhere between both versions. He concluded that Potson and McKenzie, since private litigation was pending,

were interested witnesses, and that they had not adequately identified those who tore Potson's blouse.[10] He held that the strikers in question should be reinstated. This conclusion seems to lack evidentiary support. It was established that Potson's blouse was torn and that these strikers were present. They also admitted that they grappled with Potson and McKenzie but undertook to assign reasons to excuse their conduct. The Examiner and the Board ignored the fact that the nonstrikers had a statutory right to continue working during the strike, and from this right flows their right to free access to the plant.[11] This right was violated by the striking pickets and for this reason they should be denied reinstatements.[12] The episode which followed was the natural consequence of physical interference with the rights of McKenzie and Potson. This situation is readily distinguishable from *Golay & Co., Inc v. N. L. R. B.*, 371 F.2d 259 (7 Cir. Dec. 1, 1966), which held that mass picketing for two hours could not serve as the basis for a denial of reinstatement in view of the employer's unfair labor practices. The Seventh Circuit held in *Golay* that although there had been some threats made "there was no evidence that any employee desiring to enter was prevented from doing so." In the instant case it is clear that an attempt was made to physically prevent Potson and McKenzie from going to work. We hold that Oneita was justified in denying reinstatement to Hazel Brantley, Joyce High, Evelyn Collins and Willa Mae McGee.

*Conclusion*

Therefore we grant enforcement of the Board's order with respect to the unfair labor practices in violation of section 8(a) (5), (3) and (1) which involved the sixteen female knitters and the five sew band operators. The portion of the Board's order directing the reinstatement of the eighteen strikers accused of misconduct is granted in part, but is denied with respect to Yvonne West, Janice Marshall Martin, Vermie Bodiford, Joan Long, Naomi McGee, Edna Long, Hazel Brantley, Joyce High, Evelyn Collins and Willa Mae McGee.

Enforcement granted in part and denied in part.

10. The Trial Examiner stated "at best, they [Potson and McKenzie] recalled some of those on the scene but not necessarily those who tore Potson's blouse or who may have grasped either lady."

11. Sec. 7 provides "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also *have the right to refrain from any or all of such*

*activities * * *.*" 61 Stat. 140, 29 U.S.C. § 157 (1965). (Emphasis added.) See also *United Automobile, Aircraft, & Agricultural Implement Workers of America v. Wisconsin Employment Relations Bd.*, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956).

12. *N. L. R. B. v. Trumbull Asphalt Co.*, 327 F.2d 841, 844–845 (8 Cir. 1964). Compare *N. L. R. B. v. Wichita Television Corp.*, 277 F.2d 579, 583 (10 Cir.), cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L. Ed.2d 93 (1960).